[No. S004664. Crim. No. 24382. June 27, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
EARL PRESTON JONES, Defendant and Appellant.

1120

1124

**COUNSEL**

Richard B. Mazer, under appointment by the Supreme Court, and David A. Nickerson for Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Dane R. Gillette and Frances Marie Dogan, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—A jury convicted defendant Earl Preston Jones of two counts of first degree murder (Pen. Code, § 187),[1] finding that defendant had used a firearm in the commission of each offense (§ 12022.5) and that two multiple-murder special-circumstance allegations (§ 190.2, subd. (a)(3)) were true. The jury later determined that defendant was sane at the time he committed the offenses, and at the penalty phase returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).) We conclude that one of the multiple-murder special circumstances must be set aside; in all other respects we affirm the judgment.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Prosecution Evidence*

In February 1982, defendant leased to Charles Rambert and Patricia Khan a house he owned in the Sun Valley area of Los Angeles. The landlord-tenant relationship was a stormy one, apparently because of nonpayment of rent. About a week before the murders, defendant angrily told a friend of Rambert and Kahn that unless they moved out by the weekend he would "blow them away."

On June 1, 1982, defendant told Jimmy Lindsay, a prospective renter, that his two tenants would vacate the Sun Valley house by June 4. When Rambert and Khan still had not done so on that day, Lindsay told defendant that if the couple were still in the house the next day, he would have to look for another place to rent. Defendant responded that the house would be available "one way or the other." Showing Lindsay a shotgun, defendant added that if necessary he would take his gun and move the tenants out.

At five o'clock the next morning, Betty Daniels, who lived next to the house in question, was awakened by what sounded like gunshots coming from next door. She ran to a trailer outside her house to get her son, Walter Cantwell.

Cantwell, who was already up, saw defendant come out of the house next door and walk toward the middle of the yard, at which point Daniels also observed defendant. Cantwell and Daniels, who knew defendant from prior meetings, saw defendant get into his car and drive off.

After pounding on the door of the house, Cantwell noticed defendant's car returning to the scene. Defendant got out of his car with a shotgun. When Cantwell told defendant he had heard shots, defendant replied, "Yeah, so did I." As he walked back to his car, defendant turned and said, "Don't get involved." He then left in his car.

Later that morning, defendant told his niece, Shirley Green, that he was going to Oakland to find work. He asked Green to give him the address of her uncle in Oakland and to take him to the bus station. He told Green she could keep his car.

That same morning, the police found the bodies of Rambert and Kahn lying on beds in separate bedrooms. Each had been shot in the head with a

shotgun, which was fired from roughly 10 feet away. Rambert had also been shot twice in the chest. His chin, neck and right arm bore bruise marks, indicating he had been hit with a blunt object before he was shot.

A police check of local pawnshops revealed that defendant had pawned a shotgun on the morning of the murders. Ballistics tests established that expended shotgun shells found at the scene of the murders had been fired by the pawned gun, and that buckshot found in the victims' bodies could have been fired by the same gun. A police fingerprint expert determined that a latent fingerprint lifted from the door leading to Rambert's bedroom had been made by defendant's right index finger.

The police detained defendant's bus on the way to Oakland and arrested defendant.

2. *Defense Evidence*

Dr. Alvin Davis, a psychiatrist, and Dr. Shawn Johnston, a psychologist, testified on defendant's behalf. In the opinion of Dr. Davis, defendant was suffering from paranoid schizophrenia at the time of the killings.

After giving defendant a battery of tests, Dr. Johnston concluded that defendant had been suffering from a schizophrenic disorder, probably for most of his life, and that he was subject to delusions, hallucinations, and paranoia, causing on occasion irrational anger.

Neither doctor attempted to expressly link defendant's illness to his mental state at the time of the killings.

Also testifying for the defense was defendant's ex-wife, Marcia Fuller. She said that defendant was a person of good will and integrity, but that he would get irrationally angry and suspicious. In one instance, defendant insisted that the two of them go for a ride, after which he put a gun to her head and threatened to kill her. When Fuller told him to "go ahead," defendant calmed down and acted as if nothing had happened.

B. *Sanity Phase*

Drs. Davis and Johnston again testified for the defense at the sanity phase of the trial. Both were of the view that defendant was insane when he committed the two murders. In the opinion of Dr. Davis, defendant was unable to appreciate the criminality of his actions and to conform his behavior to legal requirements. Dr. Johnston was unsure whether defendant

could appreciate the criminality of his actions but was convinced that defendant could not conform his behavior to societal requirements.[2]

In response, the prosecution called Dr. George Abe and Dr. Lee Coleman, both psychiatrists. Dr. Abe was of the opinion that defendant was paranoid but not schizophrenic and was sane when he committed the murders. Dr. Coleman testified that psychiatrists and psychologists in general are no more qualified than lay persons to determine whether a person is schizophrenic or whether a criminal defendant was sane when the offense was committed.

In rebuttal, the defense called Dr. Richard Huemer, a specialist in orthomolecular medicine. In Dr. Huemer's opinion, schizophrenia could be determined by the presence of certain chemicals in the patient's body; the high quantity of one such chemical, cryptopyrrole, in defendant's urine indicated he was schizophrenic.

## C. Penalty Phase

### 1. Prosecution Evidence

At the penalty phase of the trial, the prosecution presented evidence of two previous episodes of assaultive behavior by defendant. In 1975, four women were living at defendant's Sun Valley rental property. One day defendant came to the house and demanded an additional $10 a month in rent from each woman. He accused the women of using the house for prostitution and presenting him with a "fake bill" for a $25 pool filter that they had deducted from the rent. He then struck one of the women, Angela H., on the head with his fist. When another tenant, Jamie J., attempted to call the police, defendant brandished a knife and pulled the telephone out of the wall. The women ran next door and called the police.

The second incident involved Harold Willis, who occasionally gave defendant's wife a ride to work. In October 1978, defendant came to Willis's house and accused him of "socializing" with his wife. Defendant grabbed Willis by the neck and bounced him off a brick wall outside the house, causing lacerations to his face, head, and neck. Willis told defendant to

---

[2] At the time the offenses were committed, the sanity of a criminal defendant was measured by whether he lacked "substantial capacity either to appreciate the criminality . . . of his conduct or to conform his conduct to the requirements of law." (*People* v. *Drew* (1978) 22 Cal.3d 333, 345 [149 Cal.Rptr. 275, 583 P.2d 1318].) Section 25, subdivision (b), added by initiative three days later, provides that sanity is now determined by whether a defendant "was incapable of knowing or understanding the nature and quality of his or her act and of distinguishing right from wrong at the time of the commission of the offense."

leave, but defendant refused to do so until Willis told neighbors to call the police.

### 2. *Defense Evidence*

The chief defense witness at the penalty phase was Dr. William Vicary, a psychiatrist. He testified that defendant was paranoid but not schizophrenic. Defendant had a traumatic early childhood, to which he initially made a successful adjustment; a chronic psychotic illness led to increasingly erratic behavior. In the opinion of Dr. Vicary, there was a direct causal connection between the illness and the killings. He noted that during the trial defendant had shown a willingness to take antipsychotic medication, and that defendant had behaved well in custody. Dr. Vicary concluded that, given defendant's high intelligence, he probably would lead a productive life in prison and not be a danger to other inmates.

Defense witness Dr. Gerry McCormack, a psychologist, discussed defendant's various accomplishments in life.[3] He, too, believed that defendant would function well in a prison setting.

Other defense witnesses were defendant's ex-wife, one of his brothers, a former work partner, and a friend, all of whom said that defendant could lead a useful life in prison and that they wanted him to live.

## II. DISCUSSION

### A. *Guilt Phase Issues*

### 1. *Defendant's Motion to Disqualify the Trial Judge*

On August 25, 1983, the master calendar court ordered defendant's case assigned to Department F. At defendant's first appearance in Department F, the judge suspended proceedings to determine whether defendant was competent to stand trial (§ 1368). After the judge found defendant competent, he rejected several arguments that defendant himself presented, primarily relating to actions by his attorney. This conversation followed:

"[DEFENDANT]: All right. Sir, we are going to have a hearing. Sir, you obviously have denied me everything that I have requested, and you are

---

[3] Defendant had attended the University of California at Los Angeles, had served honorably in the armed forces, had been a candidate for the Long Beach City Council, and had been a neighborhood watch community coordinator.

doing it arbitrarily without even considering it. So then, sir, I am going to pass a Writ of Prejudice against you, sir, and this courtroom. Thank you.

". . . . . . . . . . . . . . . . .

"THE COURT: Fine.

"[DEFENDANT]: Okay. Thank you.

"THE COURT: Anything else?

"[PROSECUTING ATTORNEY]: No, your Honor.

"THE COURT: Counsel?

"[DEFENSE COUNSEL]: Nothing . . . .

"[DEFENDANT ]: Do I have to have a written Writ of Prejudice, sir? I intend to do that.

"[DEFENSE COUNSEL ]: I will prepare one, and you can file it.

". . . . . . . . . . . . . . . . .

"THE COURT: All right. Thank you gentlemen."

■ Defendant contends that his comments were tantamount to a motion to disqualify the trial judge under Code of Civil Procedure section 170.6, and that the judge erroneously denied the motion as untimely.

A party moving to disqualify a trial judge under Code of Civil Procedure section 170.6 need not give a factual basis for its belief that the judge is prejudiced. Here, defendant sought to disqualify the trial judge for having, in defendant's view, arbitrarily denied his motions. This suggests that defendant was attempting to disqualify the judge for cause (Code Civ. Proc., § 170.3, subd. (c)), and was not seeking to disqualify him under Code of Civil Procedure section 170.6.

Even if defendant's motion was an attempt to invoke the provisions of Code of Civil Procedure section 170.6, it was inadequate. Such a motion must be "supported by affidavit or declaration under penalty of perjury or an oral statement under oath that the judge . . . is prejudiced . . . so that the party . . . believes that he or she cannot have a fair and impartial trial or hearing before the judge . . . ." Defendant's motion was not supported

by such an affidavit or statement. Recognizing that the motion was deficient, defense counsel advised the court that he would prepare a written motion for defendant. But no written motion was ever filed, and defendant made no effort to renew the motion orally. Under these circumstances, we must assume that the defense decided not to cure the defects in the disqualification motion, and the motion was properly denied.

### 2. Conflict of Interest

Defendant maintains there was a conflict of interest between him and his trial counsel, David Brockway. The claimed conflict stemmed from counsel's actions that were inconsistent with the fee agreement between counsel and defendant. Defendant argues that this conflict of interest denied him his constitutional right to counsel, and that the trial court's failure to adequately inquire into the nature of the conflict was reversible error.

#### a. Facts

On June 16, 1982, shortly after his arrest, defendant retained Gladys Towles Root and David Brockway to represent him. That same day, defendant signed a deed quitclaiming his Sun Valley house to the "Secure Defense Company" (Root and Brockway), and executed a document giving Brockway a general power of attorney. Two days later, defendant and his ex-wife, Marcia Fuller, signed a contract retaining Root and Brockway. The contract specified that the $10,000 retainer fee was "secured by TD [trust deed, presumably the deed to the Sun Valley property], cash down to be arranged."

For six months, Root made almost all court appearances on defendant's behalf. After Root's death in December 1982, Brockway became defendant's sole attorney. On December 27, 1982, Brockway recorded defendant's quitclaim deed to the Sun Valley house. Two months later, Brockway executed a grant deed conveying the house to Naim and Louise Obeji.

In the spring of 1983, defendant sent the superior court three petitions for a writ of habeas corpus in which he accused Brockway of stealing and selling the Sun Valley property. Citing *People* v. *Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44], defendant asked the court for a hearing on the matter. Defendant claimed that he had executed the quitclaim deed and power of attorney to transfer title to his ex-wife, Marcia Fuller, and that Brockway had forged defendant's signature on a quitclaim deed in favor of himself.

On June 14, 1983, defendant asked for a hearing, claiming Brockway had sold defendant's Sun Valley house and had done no work on his case. When

Brockway mentioned there had been a breakdown in the attorney-client relationship, the court said it would relieve counsel, making a hearing unnecessary.

Defendant objected. He said that relieving Brockway was "not the point." He insisted on a hearing in which he could present evidence that counsel had misappropriated defendant's property, and asked for legal assistance in making this presentation. The trial court denied the request. After further discussion, the court asked if defendant wished to dismiss Brockway. Defendant said he did, and asked the court to appoint a private attorney. When the court replied it would appoint only the public defender, defendant said he would stay with Brockway.

After a recess, the court told defendant and Brockway that after further consideration it had decided to relieve Brockway as defendant's attorney. When defendant replied that was not what he wanted, the court agreed not to relieve counsel.

On July 11, 1983, the parties appeared in court, along with Lee Zorne, an attorney. Defendant requested that Zorne be appointed to represent him. The court replied that it would appoint only the public defender, but that defendant could retain Zorne at his own expense. Defendant explained he was unable to do so because his counsel (Brockway) had taken his home and sold it for $10,000.

Zorne said he would be willing to represent defendant if Brockway would return some of the funds from the sale of defendant's house. The court responded that it had no control over the return of funds and could not initiate an inquiry into the dealings between defendant and Brockway. After a lengthy discussion, the court found that the situation "would destroy any possible attorney-client relationship between Mr. Brockway and [defendant]." Brockway acknowledged there had been "a complete breakdown" of the attorney-client relationship. The court continued the matter so that the public defender could discuss the situation with defendant.

On July 15, 1983, defendant appeared in court with Brockway and Deputy Public Defender Howard Waco. Waco said he had talked to defendant, who told him that other than having financial concerns (which he refused to discuss), defendant had no problems with Brockway and still wanted him as counsel. Brockway agreed to continue his representation. Defendant apologized to the court for the accusations he had made, and the court took defendant's request to relieve Brockway off calendar.

On August 22, 1983, in the master calendar court, defendant again asked for another attorney. The court responded that the issue was to be considered by the judge assigned to try the case.

On August 25, 1983, the case was assigned for trial to Judge Kolostian, who immediately suspended proceedings to determine defendant's competence to stand trial. (§ 1368.) Shortly thereafter, defendant filed a motion for self-representation (*Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]) and sent a letter to the presiding judge of the superior court, repeating his assertion that Brockway had stolen his house.

On September 8, 1983, the trial court found defendant competent to stand trial, and a week later held a hearing on defendant's motion for self-representation. At the hearing, defendant explained he wanted only cocounsel status, not self-representation. His counsel joined in the motion, saying, "I think he would feel better and we could cooperate better, perhaps." The court granted the motion.

The next day, the trial court told defendant it had received the letter defendant had sent to the presiding judge. The trial court once again asked defendant if he wanted to be represented by the public defender. Defendant replied he did not.

On October 6, 1983, near the end of jury selection, defendant again requested that Brockway be relieved as counsel. He renewed his claim that Brockway had stolen his property and forged his signature on documents. The trial court held a *Marsden* hearing. (*People* v. *Marsden, supra,* 2 Cal.3d 118.) At the hearing, defendant did not elaborate about his financial relationship with Brockway, but asserted that Brockway was unprepared for trial, had failed to furnish defendant with police and investigation reports, and had failed to make various motions on his behalf. Brockway responded to these allegations at length. The court said that although it was willing to discharge Brockway and appoint the public defender, it would not continue the case, and trial would have to proceed even if the public defender was unprepared. It then declared a recess, after which defendant advised the court that he and Brockway had resolved their differences.

Later that day, the court had an in-chambers discussion with Brockway (apparently at Brockway's request), at which neither defendant nor the prosecutor was present. In this discussion, Brockway expressed concern that defendant's allegation that he had stolen defendant's house put him "technically in a conflict situation with [defendant]." He maintained, however, there was no conflict and defendant's allegations of forgery were "nonsense." He claimed that under his fee agreement with defendant he was to hold defendant's house in trust as security for his fee. If defendant prevailed at trial, Brockway said, the house would be put back in defendant's name, and his fee would be guaranteed by a note and a deed of trust. According to Brockway, his deceased partner, Gladys Root, had been the

subject of substantial litigation by her daughter, and he wanted to protect defendant's assets from Root's daughter and anyone who might wish to sue defendant while he was in jail. Brockway claimed that the house was "completely protected," and that defendant could have anyone he wanted live in the house rent-free during the court proceedings.

Later that day, the trial judge suggested in open court that after the trial defendant and counsel should submit their fee dispute to the State Bar's fee arbitration program. Defendant agreed. The prosecutor then mentioned that the State Bar was investigating the matter.

On October 7, 1983, jury selection was completed, and the presentation of evidence began. On October 11, defendant asked the court to replace Brockway with Attorney Marilee Marshall, who was present in the courtroom. Marshall said she was not prepared to start the case at that time and would represent defendant only if appointed by the court. The court replied it would either appoint the public defender or allow defendant to represent himself. The court had a deputy public defender talk to defendant, after which defendant decided to keep Brockway as his counsel.

On October 19, 1983, defendant again asked the trial court to discharge Brockway, this time because he had not called certain witnesses. Brockway explained he did not call those witnesses because he did not believe that their testimony would help the defense. Defendant then renewed his assertion that Brockway had stolen his home. He claimed Brockway had agreed to represent him without a fee. The court told defendant the issue should be resolved at an arbitration proceeding after the trial.

The next day, the trial court held an in-camera hearing, at which defense investigator Paul Allen discussed some of the work he had done to assist Brockway. In addition, Deputy Public Defender Waco again talked to both defendant and Brockway. Thereafter, defendant and Brockway said they were ready to proceed.

The jury convicted defendant of two counts of first degree murder, found that he was sane when he committed the crimes, and fixed the penalty at death. After the penalty phase verdict, defendant again asked the trial court to relieve Brockway. This time the court granted the request. When the public defender's office declined the appointment, the court appointed private counsel to represent defendant.

b. *General principles*

Under the federal and state Constitutions, a criminal defendant has the right to the assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const.,

art. I, § 15.) These constitutional guarantees entitle a defendant "not to some bare assistance but rather to *effective* assistance." (*People* v. *Ledesma* (1987) 43 Cal.3d 171, 215 [233 Cal.Rptr. 404, 729 P.2d 839], italics in original.) That entitlement includes the right to representation that is free from conflicts of interest. (*Wood* v. *Georgia* (1981) 450 U.S. 261, 271 [67 L.Ed.2d 220, 230, 101 S.Ct. 1097]; *People* v. *Bonin* (1989) 47 Cal.3d 808, 834 [254 Cal.Rptr. 298, 765 P.2d 460].) It applies to a defendant who retains his own counsel as well as to a defendant who is represented by appointed counsel. (*People* v. *Bonin, supra,* at p. 834; *Cuyler* v. *Sullivan* (1980) 446 U.S. 335, 344-345 [64 L.Ed.2d 333, 344, 100 S.Ct. 1708].)

Under the Sixth Amendment, when counsel is burdened by an actual conflict of interest, prejudice is presumed; the presumption arises, however, "only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" (*Strickland* v. *Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 696, 104 S.Ct. 2052], citing *Cuyler* v. *Sullivan, supra,* 446 U.S. at p. 348 [64 L.Ed.2d at p. 346].)

Conflicts of interest may arise in various factual settings. Broadly, they "embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests." (*People* v. *Bonin, supra,* 47 Cal.3d at p. 835.)

c. *Was there an actual conflict of interest?*

██ Defendant contends the record establishes the existence of an actual conflict of interest between him and counsel. He argues this conflict had three interrelated aspects.

First, defendant claims that counsel had a secondary financial interest, namely, to acquire defendant's Sun Valley house for himself before trial. This, defendant argues, was contrary to defendant's interest in having the property placed in trust until after the trial.

Second, defendant notes that at some point during the proceedings all parties knew that the State Bar was investigating defense counsel for his conduct involving defendant's property.[4] Defendant asserts that counsel's

---

[4]Ultimately the State Bar instituted disciplinary proceedings against Brockway. It found that Brockway had engaged in misconduct when he was first retained by defendant, in that he acquired an interest in the house "adverse" to defendant without giving full written disclosure of the terms of the transaction, giving defendant the opportunity to consult with independent counsel, or obtaining defendant's written consent to the transaction, in violation of

fear of facing State Bar disciplinary proceedings created a conflict of interest.

Third, defendant argues that counsel's attempts to conceal both his mishandling of defendant's property and the actual conflict of interest arising from that conduct violated counsel's legal and ethical obligations of undivided loyalty to defendant.

The record before us, however, is not sufficiently clear to enable us to determine whether Brockway's conduct with respect to defendant's Sun Valley house established an actual conflict of interest. It is true that he accepted a quitclaim deed to that property as security for his fee and then deeded the property to the Obejis. But Brockway's representations to the trial court suggest that he was attempting to protect the house from litigation against the estate of his deceased partner, Gladys Root, as well as from any lawsuits that might be brought against defendant by relatives of the murder victims. Thus, counsel assertedly acted not against his client's interests, but rather to protect them. Under these circumstances, we cannot say that counsel's actions established a direct conflict between him and his client.[5]

Nor would, as defendant contends, any fear by counsel that his conduct might subject him to discipline give rise to a conflict of interest. It would appear that fear of investigation by the State Bar would inspire an attorney to perform more, rather than less, competently.

Defendant argues that the alleged conflict of interest may have influenced some of counsel's actions at trial. He contends that the decision to enter a plea of not guilty by reason of insanity and to present a "mental state" defense at trial could have been motivated by counsel's desire to discredit defendant and thus cast doubt on defendant's claim that counsel "stole" his house. But it was defendant himself who entered the plea of not guilty by reason of insanity and, given the overwhelming evidence of guilt, a defense

---

former rule 5-101 of the Rules of Professional Conduct. We adopted the State Bar's findings. (*Brockway* v. *State Bar, ante,* p. 51 [278 Cal.Rptr. 836, 806 P.2d 308].)

[5] Defendant asks us to take judicial notice of Los Angeles Superior Court records showing that on February 29, 1984, after the jury had returned the death verdict, Brockway filed a complaint on defendant's behalf against the Obejis, the buyers of the Sun Valley house, seeking the return of the property. The complaint alleges that the house was deeded to the Obejis as security for a loan to pay legal fees and expenses in defendant's case. Defendant also asks us to take judicial notice of additional superior court records showing that in May 1984, when Brockway was no longer representing defendant in his criminal case, the Obejis quitclaimed the property to one Margaret Osborne, and that three months later Brockway married Osborne. The documents are a proper subject of judicial notice (Evid. Code, § 452). They do not, however, establish the existence of a conflict of interest between defendant and Brockway.

based on mental state was the only one that could be plausibly maintained. Similarly, although defendant faults counsel for not cross-examining prosecution witness Walter Cantwell, for not calling defendant to testify at the penalty phase, and for other tactical decisions, nothing in the record indicates that counsel's actions were in any way affected by the purported conflict of interest.

Defendant also contends that the dispute about the house prompted Brockway to urge the trial court to appoint defendant as cocounsel. Defendant points out that Brockway told the court that he and defendant could "cooperate better" if defendant was made cocounsel. According to defendant, this comment suggests that counsel was motivated by concern about the alleged conflict (his fee dispute with defendant) rather than by tactical considerations related to defendant's case.

Defendant, however, overlooks the fact that it was he who initiated the request for cocounsel status; counsel merely joined in that request. ■ Because defendant himself urged the trial court to appoint him cocounsel, he is barred from objecting on appeal to counsel's support of his request. (*People* v. *Lang* (1989) 49 Cal.3d 991, 1032 [264 Cal.Rptr. 386, 782 P.2d 627].)

### d. *Duty of inquiry*

■ Defendant contends that even if the record does not show there was an actual conflict of interest between him and counsel, the trial court was aware of a *potential* conflict of interest. Therefore, he argues, the court had a duty to inquire into the nature of the conflict and to elicit from him a knowing waiver of the right to conflict-free counsel. He asserts that the court's failure to do so deprived him of his right to conflict-free counsel.

■ When a trial court knows or should know that defense counsel has a possible conflict of interest with his client, it must inquire into the matter (*People* v. *Bonin, supra,* 47 Cal.3d at p. 836; *Wood* v. *Georgia, supra,* 450 U.S. at p. 272 [67 L.Ed.2d at pp. 230-231]; see *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 484 [55 L.Ed.2d 426, 434, 98 S.Ct. 1173]) and act in response to what its inquiry discovers (*People* v. *Bonin, supra,* 47 Cal.3d at p. 836). If the court determines that a waiver of a conflict of interest by the defendant is called for, it must assure itself that " '(1) the defendant has discussed the potential drawbacks of [potentially conflicted] representation with his attorney, or if he wishes, outside counsel, (2) that he has been made aware of the dangers and possible consequences of [such] representation in his case, (3) that he knows of his right to conflict-free representation, and (4) that he voluntarily wishes to waive that right.' (*People* v. *Mroczko* [(1983)] 35

Cal.3d [86,] 110 [197 Cal.Rptr. 52, 672 P.2d 835]; see *Glasser* v. *United States* [(1942)] 315 U.S. [60,] 71 [86 L.Ed.2d [680,] 699-700 (62 S.Ct. 457)] [to similar effect].)" (*People* v. *Bonin, supra,* at p. 837.) A trial court's failure to inquire into the possibility of a conflict of interest or to adequately respond to its inquiry is reversible error only if the defendant shows "that an actual conflict of interest existed and that that conflict adversely affected counsel's performance." (*Id.* at pp. 837-838, citations omitted.) ▮ In this case, the trial court conducted an adequate inquiry into the possibility of a conflict, as we shall explain.

In determining whether a defendant understands the nature of a possible conflict of interest with counsel, a trial court need not separately explore each foreseeable conflict and consequence. Nor does a defendant's waiver of conflict-free counsel extend only to matters discussed in detail on the record. As we observed in *Maxwell* v. *Superior Court* (1982) 30 Cal.3d 606, 621 [180 Cal.Rptr. 177, 639 P.2d 248, 18 A.L.R.4th 333], "Rules that are that strict seem neither necessary nor workable."

Contrary to defendant's assertion, here the most critical factor was not that, as a result of his interest in defendant's rental property, defense counsel had a financial motive in seeing defendant sentenced to death. Rather, the crucial factor was that the bitterness caused by the dispute over fees might lead to destruction of the attorney-client relationship. Both of the judges who had considered defendant's complaints about his attorney recognized that, and on several occasions expressed their concerns. This potential problem, however, did not obligate the trial court to obtain an explicit waiver from defendant of any possible conflict of interest. The court's only duty under these circumstances was to give defendant an opportunity to discharge his retained counsel and, if defendant was indigent, to appoint an attorney to represent him. The court repeatedly extended, and defendant consistently rejected, such an offer.

In *Maxwell* v. *Superior Court, supra,* 30 Cal.3d at page 621, we explained: "In determining whether a waiver of potential conflicts is knowing, intelligent, and unconditional, the trial court must 'navigate adroitly between the Scylla of denying a defendant the right to determine his own fate and the Charybdis of violating his right to counsel.'" When a defendant has retained counsel, the state "should keep to a 'necessary minimum its interference with the individual's desire to defend himself in whatever manner he deems best . . . .'" (*People* v. *Ortiz* (1990) 51 Cal.3d 975, 982 [275 Cal.Rptr. 191, 800 P.2d 547], quoting *People* v. *Crovedi* (1966) 65 Cal.2d 199, 208 [53 Cal.Rptr. 284, 417 P.2d 868].)

Here, the actions of the trial court reflect an appropriate concern not to violate defendant's right to retain counsel of his own choosing. (See *People*

v. *Holland* (1978) 23 Cal.3d 77, 86 [151 Cal.Rptr. 625, 588 P.2d 765].) On two occasions, the court relieved Brockway, only to reinstate him when defendant asserted his desire that Brockway continue to represent him. The court also afforded defendant several opportunities to discuss his options with a deputy public defender; after each of these conversations defendant advised the court he no longer wanted to have Brockway relieved as counsel. In light of all the circumstances, we conclude that the trial court conducted an adequate inquiry into the possibility of a conflict of interest between defendant and Brockway, and that defendant knowingly and intelligently chose to continue with Brockway's representation.

### 3. *Inconsistency of Defenses*

██ Defendant contends that, aside from any asserted conflict of interest originating from the fee agreement between counsel and him, a separate conflict of interest arose when defendant and counsel presented conflicting defenses at both the guilt and penalty phases of the trial. Defendant points out that in his personal cross-examination of the witnesses he attempted to cast doubt on the evidence that he had killed Rambert and Kahn. By contrast, counsel's theory of defense was that defendant lacked the requisite mental state to be convicted of murder, that he was insane when he committed the offenses, and that he should be spared from execution because of his mental disabilities. Defendant argues that this disagreement about defense strategy created a conflict of interest between him and counsel, and that the court's failure to inquire into this conflict was reversible error.

Defendant's argument confuses conflicts of interests with trial tactics. The presentation of conflicting defenses does not necessarily create a conflict of interest. Here, both defendant and counsel were attempting to achieve what was best for defendant, but they disagreed on trial strategy. Defendant believed he could convince the jury there was a reasonable doubt that he was the killer; counsel, on the other hand, had the far more plausible belief that a mental state defense might be successful. Because this difference of opinion on strategy did not create a situation in which counsel's efforts on defendant's behalf were threatened by "responsibilities to another client or a third person or by his own interests" (*People* v. *Bonin*, *supra*, 47 Cal.3d at p. 835), there was no conflict of interest.

Defendant further contends the presentation of conflicting defenses made a mockery of the fact-finding process, and the trial court erred in allowing this. We disagree. The presentation of conflicting defenses is often tactically unwise because it tends to weaken counsel's credibility with the jury. But this problem was not present here. Counsel may have reasonably believed that defendant's personal presentation of a defense that was manifestly

untenable—given the strength of the evidence of guilt—might help to convince the jury that defendant was mentally impaired. The decision to permit defendant to present his own theory of the case was a matter for counsel, not the court, to decide. "*[P]rofessional counsel retains complete control over the extent and nature of the defendant's participation, and of all tactical and procedural decisions.*" (*People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1164, fn. 14 [259 Cal.Rptr. 701, 774 P.2d 730], italics in original.) The trial court did not err in allowing the presentation of conflicting defenses.

### 4. *Defense Tantamount to a Guilty Plea*

■ At trial, defense counsel argued that because of defendant's mental state the jury should find him guilty only of the lesser included offense of voluntary manslaughter. In pursuing this defense over the objection of defendant, who insisted on proclaiming his innocence, defendant claims that counsel in effect presented a plea of guilty to voluntary manslaughter, thereby usurping defendant's right to decide whether or not to enter such a plea.

Defendant relies primarily on *People* v. *Frierson* (1985) 39 Cal.3d 803 [218 Cal.Rptr. 73, 705 P.2d 396]. In *Frierson*, the defendant, charged with capital murder, insisted on presenting a defense of diminished capacity. His counsel refused to do so, and presented no defense at the guilt phase, saving the evidence of diminished capacity for the penalty phase. We held that the decision whether to present a defense at the guilt phase was a "fundamental" one reserved to the defendant himself. (*Id.* at pp. 814-815.) As we said in a later decision: "[A] defense counsel's traditional power to control the conduct of a case does not include the authority to withhold the presentation of any defense at the guilt/special circumstance stage of a capital trial when the defendant openly expresses a desire to present a defense at that stage and when there exists credible evidence to support that defense." (*People* v. *Milner* (1988) 45 Cal.3d 227, 246 [246 Cal.Rptr. 713, 753 P.2d 669].)

Defendant argues that under *Frierson, supra,* 39 Cal.3d 803, an attorney may not present a defense that could result in the client's conviction of an offense less than the one charged if the client is insisting on a defense that could lead to the client's complete acquittal. In *People* v. *Burton* (1989) 48 Cal.3d 843, 857 [258 Cal.Rptr. 184, 771 P.2d 1270], we rejected the defendant's reliance on *Frierson* because "the record [did] not show that any defense he wished to present had credible evidentiary support." This is also true here.

There was overwhelming evidence that defendant had killed Rambert and Kahn. Two witnesses, both of whom knew defendant, saw him leave

the victims' house immediately after the killings. Ballistic tests established that the fatal shots had been fired from a gun defendant pawned several hours after the killings. Defendant attempted to leave the area a few hours after the crimes. There was also substantial evidence of defendant's motive for killing the victims and his threats to do so.

In view of the overwhelming evidence of guilt and the existence of a viable mental state defense, counsel chose not to argue defendant's innocence but to present a psychiatric defense, the only strategy with any chance of success. Moreover, in an apparent effort to have defendant personally participate in the defense and to let him present his own defense theory, counsel had defendant cross-examine the witnesses himself in an attempt to show that he was not the killer. We conclude there was no violation of defendant's right to make the "fundamental" decisions regarding his defense.

### 5. *Defendant's Absence From In-chambers Discussion Between Court and Defense Counsel*

 Defendant contends the trial court violated his right to be personally present at all stages of the proceedings when it held an in-chambers discussion with defense counsel in defendant's absence.

These are the relevant facts: On October 6, 1983, during jury selection, defendant repeated his charges that trial counsel was doing a poor job of representing him and was trying to steal his house. The court conducted a hearing into the allegations. Defendant informed the court that he thought his differences with counsel had been resolved. The court then took a recess for lunch. Before proceedings were resumed, the court had a discussion in chambers with defense counsel, apparently at counsel's request, at which neither the prosecutor nor defendant was present. Counsel gave the court additional information about his fee agreement with defendant. (See discussion, *ante,* at pp. 1132-1133.)

 A defendant's right to be present at trial is embodied in the Sixth and Fourteenth Amendments of the federal Constitution; in article I, section 15, of the California Constitution; and in sections 977 and 1043 of the Penal Code. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 517 [268 Cal.Rptr. 126, 788 P.2d 640].) As a general rule, however, "the accused is not entitled to be personally present during proceedings which bear no reasonable, substantial relation to his opportunity to defend the charges against him, and '[t]he burden is upon defendant to demonstrate that his absence prejudiced his case or denied him a fair and impartial trial.' [Citations.]" (*People* v. *Hovey* (1988) 44 Cal.3d 543, 573-574 [244 Cal.Rptr. 121, 749 P.2d 776].)

In *Hovey*, the trial court held a hearing outside of the defendant's presence to determine whether trial counsel was providing effective assistance. In concluding that the defendant was properly excluded from the hearing, we said: "[I]t is very doubtful . . . that a criminal defendant's presence should be required at in-chambers inquiries regarding his counsel's competence, unless the defendant himself has initiated the inquiry. Attendance at the meeting could well undermine the confidence and cooperation so necessary to insure an effective representation." (*People* v. *Hovey, supra,* 44 Cal.3d at p. 573.)

■ Here, as in *Hovey, supra,* 44 Cal.3d 543, the meeting between defense counsel and the trial court occurred at a time when defendant was not objecting to the quality of his counsel's representation. Defendant claims that the conference was a continuation of the hearing held earlier that day. He is wrong. That hearing was completed when defendant informed the court he had resolved his differences with counsel and no longer wanted to discharge him. Counsel's apparent purpose in requesting the in-chambers conference was to let the court know he was willing to place on the record additional details about the financial arrangements between him and defendant. Under these circumstances, the trial court did not err in discussing the matter outside of defendant's presence.

### 6. *Failure to Conduct a Faretta Hearing*

■ Before trial, the court granted defendant's request for cocounsel status. Defendant claims that by becoming cocounsel he gave up his right to counsel with regard to those aspects of the trial that he personally handled. He argues that before permitting him to become cocounsel, the trial court should have warned him of the dangers of self-representation and should have conducted a hearing to determine whether he was mentally competent to waive his right to counsel.

■ A defendant in a criminal case has a constitutionally guaranteed right of self-representation. (*Faretta* v. *California, supra,* 422 U.S. 806; *People* v. *Andrews* (1989) 49 Cal.3d 200, 219 [260 Cal.Rptr. 583, 776 P.2d 285].) But before a motion for self-representation is granted, the defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" (*Faretta* v. *California, supra,* 422 U.S. at p. 835 [45 L.Ed.2d at p. 582]; see also *People* v. *Bloom* (1989) 48 Cal.3d 1194, 1224-1225 [259 Cal.Rptr. 669, 774 P.2d 698].)

■ This court has never expressly determined whether a defendant who has been granted cocounsel status must be given *Faretta* warnings. (Cf.

*People* v. *Bloom, supra,* 48 Cal.3d at p. 1224 [implying that a defendant who obtains self-representation with advisory counsel must be so warned].) A resolution of the issue depends on the nature of the relationship between the defendant and the attorney. We have previously recognized that, although there are variations, there are only two basic categories of representation: professional representation and self-representation.

"If [the defendant] chooses professional representation, he waives tactical control; *counsel* is at all times in charge of the case and bears the responsibility for providing constitutionally effective assistance. Upon a 'substantial' showing . . . the court *may* nonetheless permit the accused a limited role as cocounsel. *Even so, professional counsel retains complete control over the extent and nature of the defendant's participation, and of all tactical and procedural decisions.* Of course, the accused is responsible for his own mistakes while acting as cocounsel, unless they are directly traceable to his attorney . . . . [¶] On the other hand, if the accused decides to represent himself under *Faretta, he* assumes primary control of, and responsibility for, his defense. [Citations.] The court *may,* and in a proper case should, appoint counsel to assist in an 'advisory' capacity . . . . Of course, the court is not foreclosed from permitting a greater role for counsel assisting a *Faretta* defendant, so long as defendant's right to present his case in his own way is not compromised." *(People* v. *Hamilton, supra,* 48 Cal.3d at p. 1164, fn. 14, italics in original.)

 A defendant's entitlement to *Faretta* warnings turns on which form of representation the defendant selects. If the defendant chooses self-representation, *Faretta* requires that the defendant be warned of the dangers and pitfalls of doing so. *(Faretta* v. *California, supra,* 422 U.S. at p. 835 [45 L.Ed.2d at pp. 581-582].) These warnings must be given even when the defendant has counsel to assist in an advisory capacity. So long as the defendant, by choosing to act as his or her own attorney, has assumed responsibility for the case, the defendant has forfeited the right to have an attorney make the critical strategic and tactical decisions pertaining to the defense, and has thus waived the right to counsel. In such a situation, the record must show that the defendant "understood the disadvantages of self-representation, including the risks and complexities of the particular case." *(People* v. *Bloom, supra,* 48 Cal.3d at p. 1225.)

If, on the other hand, a defendant chooses to be represented by counsel and the trial court allows the defendant a limited role as cocounsel, the defendant has not waived the right to counsel. The defense attorney retains control over the case and can prevent the defendant from taking actions that may seriously harm the defense. In that situation, the trial court may, but need not, warn the defendant of the problems of being cocounsel.

Here, defendant elected to have professional representation, not self-representation. Although defendant actively participated in the presentation of his defense, his attorney retained overall control. Counsel made the opening statements and the closing arguments, conducted voir dire of the jury, conducted most of the questioning of witnesses, submitted jury instructions, and (except for motions relating to defendant's appearance, such as requests for a haircut and a new suit) argued almost all of the motions made before the court. At no time did defendant veto any of counsel's decisions. Based on these facts, we conclude that defendant did not waive his right to counsel, that defendant was represented by counsel, and that the trial court therefore had no duty to warn him of the dangers of self-representation.

The cases relied on by defendant, *People* v. *Spencer* (1984) 153 Cal.App.3d 931 [200 Cal.Rptr. 693] and *United States* v. *Kimmel* (9th Cir. 1982) 672 F.2d 720, are distinguishable. In each, the defense attorney acted in an advisory capacity while the defendant assumed the dominant role in the presentation of the defense. Here, as pointed out above, trial counsel retained control of the defense.[6]

Defendant further contends that, before allowing him to become cocounsel, the trial court should have determined whether he was mentally competent to waive his right to counsel. The argument rests on the erroneous assumption that defendant waived his right to counsel. As discussed earlier, however, no waiver ever occurred. Moreover, before granting defendant cocounsel status, the trial court, after a hearing, found defendant competent to stand trial, and thus could rely on that finding when it granted defendant's request to act as cocounsel.

### 7. *Prosecutorial Misconduct*

At the guilt phase of trial, the prosecutor cross-examined two expert witnesses (a psychiatrist and a psychologist) about a particular study involving "normal" college students who had themselves admitted to a mental institution, where they convinced psychiatrists they were schizophrenic. Defendant challenges the propriety of this questioning on two grounds.

---

[6] Both *Spencer* and *Kimmel* suggest that whenever the accused "assumes functions that are at the core of the lawyer's traditional role," the trial court must advise the accused of the dangers of acting as cocounsel and obtain a knowing waiver of the accused's right to counsel. (*Kimmel, supra*, 662 F.2d at p. 721; *Spencer, supra*, 153 Cal.App.3d at p. 939.) Neither court, however, attempts to explain what the attorney's "core functions" are. To the extent these cases may be read to hold that a defendant who has opted for professional representation must nevertheless be given "*Faretta* warnings" and waive the right to counsel, we consider them unpersuasive.

 First, defendant claims that, because the prosecutor's questions indicated his familiarity with the study and his belief that the study demonstrated the unreliability of psychiatric diagnoses, the prosecutor engaged in misconduct. An attorney does not engage in misconduct merely by showing familiarity with studies about which the attorney is questioning an expert witness. In any event, in this case the defense never objected to either the prosecutor's questions or the doctors' answers. Unless an objection would be futile, failure to timely object to prosecutorial misconduct results in a waiver of the issue on appeal. (*People v. Green* (1980) 27 Cal.3d 1, 34 [164 Cal.Rptr. 1, 609 P.2d 468].) Here, even if the prosecutor's actions were deemed to be misconduct, a timely objection would have cured any resulting harm. Defendant, therefore, may not now raise this issue.

 Second, defendant asserts the prosecutor's questioning violated Evidence Code section 721, subdivision (b), which states in relevant part: "If a witness testifying as an expert testifies in the form of an opinion, he may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless: [¶] (1) The witness referred to, considered, or relied upon such publication in arriving at or forming his opinion; or [¶] (2) Such publication has been admitted in evidence." Again, the defense waived the issue by failing to object to the questions. Moreover, any possible violation of Evidence Code section 721 could not have affected the jury's verdict.

8. *Flight Instruction*

 Over defense objection, the trial court gave the jury at the guilt phase this instruction on flight: "The flight of a person immediately after the commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt but is a fact which if proved may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." (CALJIC No. 2.52 (4th ed. 1979).)[7]

In arguing that the trial court erred in giving this instruction, defendant relies on a line of cases stating that the flight instruction should not be given when "identity is a contested issue." (*People v. Anjell* (1979) 100 Cal.App.3d 189, 199 [160 Cal.Rptr. 669]; see also *People v. Jackson* (1986) 187 Cal.App.3d 499, 511 [231 Cal.Rptr. 889]; *People v. Malgren* (1983) 139 Cal.App.3d 234, 242 [188 Cal.Rptr. 569]; *People v. Moringlane* (1982) 127

---

[7] All further references to CALJIC instructions are to the fourth edition unless otherwise noted.

Cal.App.3d 811, 821 [179 Cal.Rptr. 726].) Recently, we disapproved this language as "overly broad dictum." (*People* v. *Mason* (1991) 52 Cal.3d 909, 943, fn. 13 [277 Cal.Rptr. 166, 802 P.2d 950]; see also *People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1245 [278 Cal.Rptr. 640, 805 P.2d 899].) In *Mason*, we explained that it is proper for the trial court to instruct on flight if "there is evidence identifying the person who fled as the defendant, and if such evidence 'is relied upon as tending to show guilt' . . . ." (*People* v. *Mason*, *supra*, 52 Cal.3d at p. 943, quoting § 1127c.) Here, there was evidence that defendant fled from the crime scene and that he attempted to leave town unexpectedly within hours after the killings. The prosecution relied on this evidence as tending to show that defendant committed the crimes.[8] The trial court therefore did not err in giving the flight instruction.

### 9. *Instruction on Mental Condition*

 The trial court instructed the jury that it could consider for a limited purpose evidence of defendant's mental condition at the time of the crimes. The instruction, a modified version of CALJIC No. 3.36, stated: "Evidence has been received regarding a mental disease, mental defect, or mental disorder of the Defendant Earl Jones at the time of the offenses charged including lesser included crimes. You may consider such evidence solely for the purpose of determining whether or not the Defendant Earl Jones *actually formed the mental states and specific intent which are elements of the crimes charged*." (Italics added.)

Defendant faults the trial court for giving the italicized portion of the instruction. He argues that the court had a duty to specify each of the mental states to which the evidence of mental disease or defect was relevant. We disagree.

The instructions that defined the charged crimes described the mental states necessary for the commission of those offenses. In addition, the trial court gave CALJIC No. 3.31.5 (concurrence of act and mental state), which told the jury that the mental states required for the commission of first degree murder were premeditation, deliberation and malice aforethought, while the requisite mental state for the commission of second degree murder was malice aforethought. There was no need for the trial court to reiterate this information in its modified version of CALJIC No. 3.36.

---

[8] Although defense counsel did not dispute defendant's identity as the killer, defendant's personal examination of witnesses placed his identity in issue.

B. *Penalty Phase Issues*

1. *Defendant's Challenge of Certain Instructions*

 Defendant contends the penalty phase instructions were defective in three respects.

First, defendant argues the instruction on the factors the jury could consider in determining penalty failed to tell the jury it could consider mitigating evidence that had been presented at the penalty phase and that was not directly related to the circumstances of the charged offenses.[9]

In *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], we held that to avoid potential confusion a trial court should instruct a jury at the penalty phase that it may consider in mitigation any " 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' . . ." (*Id.* at p. 878, fn. 10, quoting *Lockett* v. *Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 990, 98 S.Ct. 2954] [plur. opn.], brackets in *Easley.*) In this case, the trial court gave the penalty phase instructions on November 10, 1983, three days after the filing of our opinion in *Easley.* The trial court, which was apparently unaware of that decision, did not give the *Easley* instruction.

The trial court, however, did instruct the jury to consider "any . . . circumstance which extenuates the gravity of the crime even though it was

---

[9] The instruction, a modified version of CALJIC former No. 8.84.1, read: "In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, except as you may be hereafter instructed. You shall consider, take into account and be guided by the following factors, if applicable:

"The circumstances of the crime of which the defendant was convicted in the present proceeding, and the existence of any special circumstance found to be true.

"The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence.

"The presence or absence of any felony conviction.

"Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"Whether or not the victim was a participant in defendant's homicidal conduct or the homicidal act.

"Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"Whether or not the defendant acted under extreme duress.

"Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect.

"The age of the defendant at the time of the crime.

"Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

not a legal excuse for the crime." (§ 190.3, factor (k); CALJIC former No. 8.84.1, factor (k).) Unless misled, a reasonable jury would recognize that this instruction requires consideration of mitigating character and background evidence presented at trial. (*Boyde* v. *California* (1990) 494 U.S. 370, __-__ [108 L.Ed.2d 316, 329-330, 110 S.Ct. 1190, 1198-1199]; *People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1225 [275 Cal.Rptr. 729, 800 P.2d 1159].) Here, the prosecution never suggested that the jury disregard the mitigating evidence presented by defendant. There is no reasonable likelihood that the jury did not understand it could consider such evidence.

Second, defendant contends the trial court should have deleted from the instruction at issue those aggravating and mitigating factors that were irrelevant to his case. It is now settled that a trial court has no duty to do so. (See, e.g., *People* v. *Lewis* (1990) 50 Cal.3d 262, 280 [266 Cal.Rptr. 834, 786 P.2d 892]; *People* v. *Bonin*, *supra*, 47 Cal.3d at p. 854; *People* v. *Miranda* (1987) 44 Cal.3d 57, 104-105 [241 Cal.Rptr. 594, 744 P.2d 1127].)

Third, defendant argues the trial court erred when it gave the jury this instruction, based on the then-standard admonition contained in CALJIC No. 8.84.2: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the State Prison for life without the possibility of parole." Defendant asserts the instruction misled the jury about the scope of its sentencing discretion.

Two years after defendant's trial, in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440] (revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837]), we held that the instruction in question could mislead the jury regarding the manner in which it was to determine penalty. As we explained recently in *People* v. *Lang*, *supra*, 49 Cal.3d 991, 1033-1034: "One danger is that the jury might believe it could perform the weighing process in a mechanical fashion by comparing the number of factors in aggravation with the number in mitigation, or by the arbitrary assignment of weights to the factors. [Citation.] The other danger is that the jury might fail to understand that our statutory scheme does not require any juror to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances." In those cases in which this potentially misleading instruction was given, we examine the record to determine whether the jury might have been misled to the defendant's prejudice about the scope of its sentencing discretion. (*People* v. *Allen* (1986) 42 Cal.3d 1222, 1277 [232 Cal.Rptr. 849, 729 P.2d 115]; *People* v.

*Brown, supra*, 40 Cal.3d at p. 544, fn. 17.) Here, it is unlikely the jury was so misled, as we shall explain.

The trial court instructed the jury it could consider "pity, sympathy, or sentiment for the defendant." In view of this instruction, "it is unlikely that a juror would have interpreted the instructions as a whole to require him or her to return a death verdict even if he or she did not personally believe that the death penalty was warranted under all the circumstances." (*People* v. *Ramirez* (1990) 50 Cal.3d 1158, 1200 [270 Cal.Rptr. 286, 791 P.2d 965].)

██ Nor could the jury have been misled by the prosecutor's brief remarks in his closing argument on the nature of the jury's task, which he explained as follows: "Now, in this state, reaching your decision as to whether the death penalty should be the appropriate punishment or whether . . . life without the possibility is the appropriate punishment, the law . . . requires a balancing process. [¶] You as jurors individually and collectively must balance the aggravating circumstances of the crime against the mitigating circumstances of the crime. [¶] As to any particular circumstance that you find to be [a] circumstance in aggravation or circumstance in mitigation, you are to give it which ever [*sic*] weight you feel it's entitled to. [¶] Some circumstances you will find should be entitled to little or no weight. Others you will find entitled to great weight. [¶] If you do that, go through this weighing process, I think you will see clearly that there is only one appropriate punishment in this case; that is, the death penalty." The prosecutor's brief explanation accurately described the nature of the jury's task. The jury, therefore, could not have been misled about the scope of its sentencing discretion.[10]

### 2. *Duplicative Use of Multiple-murder Special Circumstance*

██ Defendant was charged with two multiple-murder special circumstances, which the jury, at the guilt phase of the trial, found to be true. (§ 190.2, subd. (a)(3).)[11] As defendant points out, we have held that when a defendant kills two persons the People should allege only one multiple-murder special circumstance; the use of two such special circumstance allegations artificially inflates the seriousness of the defendant's conduct. (*People* v. *Harris* (1984) 36 Cal.3d 36, 67 [201 Cal.Rptr. 782, 679 P.2d 433] (plur. opn.).) Accordingly, one of the two special circumstances found to be

[10] Because of this conclusion, we need not address the continuing validity of *People* v. *Brown, supra*, 40 Cal.3d 512, in light of the United States Supreme Court's decision in *Blystone* v. *Pennsylvania* (1990) 494 U.S. 299 [108 L.Ed.2d 255, 110 S.Ct. 1078].

[11] Section 190.2, subdivision(a)(3) establishes the existence of a special circumstance when "[t]he defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree."

true in this case must be set aside. (*People* v. *Gallego* (1990) 52 Cal.3d 115, 201 [276 Cal.Rptr. 679, 802 P.2d 169]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1051 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Allen*, *supra*, 42 Cal.3d at p. 1273.)

Defendant maintains that the error prejudicially affected the jury's penalty determination. We disagree. We have consistently found that an error of this nature is harmless (*People* v. *Gallego*, *supra*, 52 Cal.3d at p. 201), and we do so here. Although we assume that the jury considered the invalid special-circumstance finding independent of its underlying facts, we cannot conclude that the jury gave the finding any significant weight. (*People* v. *Hamilton* (1988) 46 Cal.3d 123, 151 [249 Cal.Rptr. 320, 756 P.2d 1348].) There is no reasonable possibility that the extra special circumstance affected the verdict.

### 3. *Ineffective Assistance of Counsel*

■ Defendant contends his trial counsel failed to adequately represent him at the penalty phase. He points to four instances of counsel's alleged failings.

First, defendant complains about his counsel's direct examination of defense witness Dr. Vicary, a psychiatrist. In response to counsel's questioning, Dr. Vicary acknowledged the presence of aggravating as well as mitigating circumstances in the case. Counsel then told Dr. Vicary: "[D]iscuss the aggravating things. The things that go against Mr. Jones in this case." Dr. Vicary did so. He considered the following circumstances to be aggravating: "two innocent people were brutally murdered without any chance of escape"; the offense was committed "using stealth and surprise"; defendant "never expressed one iota of remorse" for the victims; defendant had committed previous "violent" and "brutal" acts without justification or excuse; and defendant was "a con artist and a bully," who "does not seem to have any significant regard for the feelings or the interests of other people with whom he interacts." Defendant contends that, in eliciting this "extremely damaging" testimony, his counsel provided ineffective representation. We disagree.

Dr. Vicary's summary of aggravating circumstances was the preface to a detailed discussion of those factors he found to be mitigating. By having Dr. Vicary briefly describe to the jury the aggravating circumstances before discussing at length the mitigating factors, defense counsel portrayed the expert witness as objective and reasonable, in an apparent attempt to enhance the credibility of the witness. Also, the aggravating factors that Dr. Vicary had mentioned were mostly matters of which the jury was already

aware; thus, Dr. Vicary's reference to them did not prejudice defendant. The presence of mitigating factors, however, was less apparent, and therefore Dr. Vicary's elaboration of them was beneficial to defendant. Because reasonable trial tactics appear to underlie defense counsel's actions, defendant has not established that counsel's performance was deficient. (See, e.g., *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

Second, defendant faults his counsel for conceding in closing argument at the penalty phase that defendant's prior involvement in acts of violence and the manner in which he committed the killings in this case were aggravating circumstances. Defendant claims that these concessions demonstrate counsel's inadequacy. He points out that a defense attorney may not argue against the client (*People* v. *Lang* (1974) 11 Cal.3d 134, 139 [113 Cal.Rptr. 9, 520 P.2d 393]; *People* v. *Diggs* (1986) 177 Cal.App.3d 958, 970 [223 Cal.Rptr. 361]; *People* v. *Cropper* (1979) 89 Cal.App.3d 716, 721 [152 Cal.Rptr. 555]), and asserts that counsel "dehumanized" him by stressing the horror of the two murders.

There is a plausible tactical justification for defense counsel's actions. Counsel apparently believed that the most persuasive argument would be to concede the presence of aggravating factors, which were readily apparent to the jury anyway, but to stress the mitigating circumstances, and to argue that the predominant mitigating factors justified a sentence less than death. It is within the permissible range of tactics for defense counsel to candidly recognize the weaknesses in the defense in closing argument. (*People* v. *Wade* (1988) 44 Cal.3d 975, 988, 998 [244 Cal.Rptr. 905, 750 P.2d 794]; *People* v. *Jackson* (1980) 28 Cal.3d 264, 292-293 [168 Cal.Rptr. 603, 618 P.2d 149].) Defendant has not demonstrated that counsel's representation was inadequate in this regard.

Third, defendant claims that his attorney did not render effective representation when he informed the jury it could consider in aggravation the absence of two mitigating factors (participation by the victim in the offense and belief by the defendant that the offense was morally justified). In his argument, defense counsel reviewed each of the aggravating and mitigating factors on which the jury was instructed. He told the jury that because there was no evidence that the victims participated in the acts leading to the murders or that the crimes were morally justified, each of these factors could be considered in aggravation.

At the time of defendant's trial, the law in this area was unsettled. After defendant's trial, we held that the absence of mitigating factors should not be considered aggravating in itself and that an argument to this effect "is

likely to confuse the jury as to the meaning of 'aggravation' and 'mitigation' under the statute and is therefore improper . . . ." (*People* v. *Davenport* (1985) 41 Cal.3d 247, 290 [221 Cal.Rptr. 794, 710 P.2d 861] (plur. opn.).) Thereafter, in *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1035, footnote 16 [254 Cal.Rptr. 586, 766 P.2d 1], we said that in cases tried before *Davenport* was decided, it would be unfair to characterize as inadequate a defense counsel's failure to object when a prosecutor in closing argument claimed that the absence of mitigating factors should be considered in aggravation. Counsel's argument here falls into a similar category.

In any event, defense counsel's erroneous interpretation of the law was not prejudicial. Although he told the jury that it could consider the absence of the two mitigating circumstances in aggravation, counsel never suggested that the jury should give substantial weight to their absence, and we consider it unlikely that the jury did so. Counsel's brief comments in his closing argument were not sufficiently serious "to undermine confidence in the outcome" of the jury's penalty determination. (*People* v. *Ramirez, supra*, 50 Cal.3d 1158, 1189; see *Strickland* v. *Washington, supra*, 466 U.S. at pp. 693-694 [80 L.Ed.2d at p. 697].)

Fourth, defendant faults his attorney for failing to object when the prosecutor in closing argument asserted that mitigating factors relating to defendant's mental impairment and his ability to appreciate the criminality of his conduct were not applicable in this case. The prosecutor argued: "In light of the testimony of Dr. Vicary, I would—and all the evidence in this case—I would submit that [any factor relating to defendant's mental impairment] does not apply in this case. [¶] There is no doubt that some people in this community, in the world, in our country, suffer from mental illness. I don't think that applies to Earl Jones. [¶] There is no evidence that he's ever lost contact with reality in any significant way, and I think he's using that as a shield to justify what he has done. Justify his cruelty. [¶] A great difference between the people significantly affected by mental illness and Earl Jones." Defendant contends the prosecutor's argument misstated the testimony of Dr. Vicary, and inappropriately implied that the mental illness could be mitigating only if the accused had "lost contact with reality in any significant way."

Defendant misconstrues the thrust of the prosecutor's argument. The prosecutor was not attempting to describe Dr. Vicary's testimony or to instruct the jury on the scope of any mitigating circumstance. Rather, he simply asserted that mitigating factors relating to mental illness did not apply in light of "all the evidence in this case." His statements were within the reasonable bounds of argument. Moreover, any conceivable inadequacy on the part of defense counsel in failing to object was harmless. (*People* v.

*Ramirez, supra,* 50 Cal.3d at p. 1189; *Strickland* v. *Washington, supra,* 466 U.S. at pp. 693-694 [80 L.Ed.2d at p. 697].)

### 4. *Prior Assaults*

■ Defendant argues that the prosecution should not have been permitted to introduce evidence of defendant's prior assaults on a former tenant and on a man who had given defendant's wife a ride to work, because the statute of limitations for prosecution of those offenses had expired at the time of his trial. We have previously rejected similar claims. (*People* v. *Robertson* (1989) 48 Cal.3d 18, 43 [255 Cal.Rptr. 631, 767 P.2d 1109]; *People* v. *Jennings* (1988) 46 Cal.3d 963, 981 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Heishman* (1988) 45 Cal.3d 147, 192 [246 Cal.Rptr. 673, 753 P.2d 629].)

### 5. *Trial Court's Failure to Suspend Proceedings for Competency Determination*

After the trial court denied defendant's motion for modification of the death verdict, but before it pronounced judgment, defense counsel[12] asked the court to suspend proceedings under section 1368 and to conduct a hearing to determine whether defendant was mentally competent. Counsel stated that for a substantial period of time defendant had been unable to assist in the preparation and defense of the case, "including the proceedings being held here today." He added that Dr. Gloria Keyes, a psychiatrist, was present and would so testify. The trial court denied the motion without hearing from the psychiatrist. Defendant contends the trial court erred in denying the motion to suspend proceedings and in denying the request to have Dr. Keyes testify.

■ A defendant who, as a result of mental disorder or developmental disability, is "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner," is incompetent to stand trial. (§ 1367.) When the accused presents substantial evidence of incompetence, due process requires that the trial court conduct a full competency hearing. (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476].) Evidence is "substantial" if it raises a reasonable doubt about the defendant's competence to stand trial. (*Moore* v. *United States* (9th Cir. 1972) 464 F.2d 663, 666.) The court's duty to conduct a competency hearing arises when such evidence is

---

[12] At that point, defendant was no longer represented by Attorney Brockway. The trial court had appointed new counsel to represent defendant on his motion for a new trial and a modification of the sentence.

presented at any time "prior to judgment." (§ 1368; see also § 1367; *People v. Zatko* (1978) 80 Cal.App.3d 534, 548 [145 Cal.Rptr. 643]; *People v. Melissakis* (1976) 56 Cal.App.3d 52, 62 [128 Cal.Rptr. 122].)

When a competency hearing has already been held and the defendant has been found competent to stand trial, however, a trial court need not suspend proceedings to conduct a second competency hearing unless it "is presented with a substantial change of circumstances or with new evidence" casting a serious doubt on the validity of that finding. (*People v. Zatko, supra,* 80 Cal.App.3d at p. 548; *People v. Melissakis, supra,* 56 Cal.App.3d at p. 62.)

■ Here, in pretrial proceedings, defendant had already been found competent to stand trial. After the trial, before the court's pronouncement of judgment, defense counsel sought reconsideration of that finding. Counsel, however, failed to show that there was a substantial change of circumstances or that there was new evidence that cast serious doubt on the pretrial finding of competency. Although counsel asserted that defendant was unable to cooperate with his attorneys, he offered no facts to support that claim. Defendant argues that the mere statement by his counsel that a psychiatrist was present who could testify to defendant's claimed incompetence was in itself substantial evidence of incompetence. But in the absence of an explicit description of the testimony that Dr. Keyes could offer in this regard, counsel's representations did not cast serious doubt on the results of the earlier competency determination.

When defense counsel has presented substantial evidence that a defendant is incompetent to stand trial, the trial court must declare a doubt as to the defendant's competence and suspend proceedings even if the court's own observations lead it to believe the defendant is competent. (*People v. Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) But when, as in this case, a competency hearing has already been held, the trial court may appropriately take its personal observations into account in determining whether there has been some significant change in the defendant's mental state. This is particularly true when, as here, the defendant has actively participated in the trial. The trial court had an opportunity to observe, and converse with, defendant throughout the trial itself and the posttrial proceedings. The court appropriately considered these observations in concluding that defendant's condition was essentially unchanged from the start of trial, when the court found him competent, to the time he was sentenced, when defense counsel asked that proceedings again be suspended.

Defendant contends that even if counsel made an inadequate showing that defendant's mental condition had worsened, the trial court nevertheless

erred when it denied the defense the opportunity to present the testimony of Dr. Keyes. By refusing to permit this testimony, defendant asserts, the court improperly precluded the defense from showing that defendant had become incompetent. We disagree.

As we noted above, defense counsel offered only a general description of the proposed testimony by Dr. Keyes; counsel made no attempt to explain to the trial court how Dr. Keyes would show a change in circumstances or how she would cast doubt on the previous finding of competence. In the absence of a more specific offer of proof, we cannot assume that the testimony of Dr. Keyes would have established a need to conduct a new competency hearing. Counsel merely said that Dr. Keyes "has had the benefits of going over the materials provided to her by the defense which I might add materials some of which were not presented to the psychiatrists at the time of the competency hearing." But counsel made no attempt to describe the materials that he had given to Dr. Keyes; there was nothing before the trial court to indicate that those materials would have significantly affected the competency determination.

Moreover, defense counsel never asserted that Dr. Keyes had examined defendant. We have said: "'If a psychiatrist . . . *who has had sufficient opportunity to examine the accused*, states under oath with particularity that in his professional opinion the accused is, because of mental illness, incapable of understanding the purpose or nature of the criminal proceedings being taken against him or is incapable of assisting in his defense or cooperating with counsel, the substantial-evidence test is satisfied.'" (*People* v. *Stankewitz, supra*, 32 Cal.3d 80, 92, quoting *People* v. *Pennington, supra*, 66 Cal.2d at p. 519, italics added.) Here, counsel's offer of proof did not establish that Dr. Keyes had "sufficient opportunity to examine the accused."

In summary, defense counsel's offer of proof gave the trial court no reason to believe that the testimony of Dr. Keyes would demonstrate "a substantial change of circumstances" that would require a renewed inquiry into defendant's competence to stand trial. Under these circumstances, the trial court did not err when it declined to hear Dr. Keyes's testimony.

6. *Constitutionality of the California Death Penalty Law*

Defendant contends the California death penalty law (§ 190 et seq.) is unconstitutional because it does not (1) distinguish mitigating from aggravating factors; (2) exclude nonstatutory aggravating factors as a basis for the death penalty; (3) require written findings on the aggravating factors; (4) require that aggravating factors be proved beyond a reasonable doubt; (5) require jury unanimity on aggravating factors; (6) require a jury finding

that aggravating factors outweigh mitigating ones beyond a reasonable doubt; (7) require a finding that death is the appropriate penalty beyond a reasonable doubt; and (8) require proportionality review. We have rejected each of these claims in previous decisions. (See *People* v. *Andrews, supra,* 49 Cal.3d at pp. 232-233, and cases cited there.)

### 7. *Proportionality Review*

■ We reject defendant's contention that based on the circumstances surrounding the killings and his personal characteristics, the death penalty, as applied to him, is unconstitutionally arbitrary, discriminatory, and disproportionate. Defendant has a history of violent assaultive behavior. His killings of the two victims in their beds were cold-blooded and premeditated. Applying the standards enunciated in *People* v. *Dillon* (1983) 34 Cal.3d 441, 477-484 [194 Cal.Rptr. 390, 668 P.2d 697], we cannot conclude that the penalty here is disproportionate to either the offenses or the offender.

Defendant also asks us to conduct a comparative "intercase" sentence review to determine whether the penalty is impermissibly cruel or unusual punishment under article I, section 17 of the California Constitution. We have repeatedly held that such review is not required. (See, e.g., *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 112 [270 Cal.Rptr. 817, 793 P.2d 23].)

### III. CONCLUSION

One of the multiple-murder special-circumstance findings is vacated; the judgment is affirmed in all other respects.

Lucas, C. J., Broussard, J., Panelli, J., Arabian, J., and Baxter, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt and death eligibility. Although I believe that one of the multiple-murder special-circumstance findings must be vacated, I have found no error warranting reversal on either of those two issues.

I dissent, however, as to penalty. As I shall explain, the trial court erred prejudicially by ruling as it did on defendant's motion for a hearing on mental competence.

Penal Code section 1367 declares that "A person cannot be tried or adjudged to punishment while such person is mentally incompetent." The due process clauses of the Fifth and Fourteenth Amendments to the United States Constitution entitle a defendant to a hearing on the question of

competence as a matter of right if he comes forward with substantial evidence of incompetence. (*People* v. *Stankewitz* (1982) 32 Cal.3d 80, 92 [184 Cal.Rptr. 611, 648 P.2d 578, 23 A.L.R.4th 476]; *People* v. *Pennington* (1967) 66 Cal.2d 508, 518 [58 Cal.Rptr. 374, 426 P.2d 942].) So too do the due process clauses of article I, sections 7 and 15, of the California Constitution. The denial of a hearing when the foregoing condition is met is violative of due process and prejudicial per se. This is true under the federal charter. (*People* v. *Stankewitz, supra*, 32 Cal.3d at p. 94; *People* v. *Pennington, supra*, 66 Cal.2d at p. 521.) It is also true under the state charter. Beyond question, the due process clauses of the federal and state Constitutions each entitle a defendant to an *opportunity* to come forward with evidence of incompetence. The denial of such an opportunity is itself violative of each of the constitutional guaranties and prejudicial per se: the defect renders the procedure fundamentally unfair and its result substantially unreliable.

Immediately before sentencing, defendant moved through counsel for a hearing on mental competence and requested permission to call Dr. Gloria Keyes, a psychiatrist, in order to present evidence of incompetence. The trial court perfunctorily denied the motion and summarily refused the request.

By acting as it did, the trial court committed prejudicial error. It plainly denied defendant an opportunity to come forward with evidence of incompetence—evidence he was "ready, willing, and able" to present through the testimony of Dr. Keyes.

The majority find no error. Their reasoning, however, does not support their conclusion.

It may well be that a court may deny a motion for a hearing on mental competence because of an inadequate offer of proof. The court here could not have properly denied defendant's motion on that basis. It did not request or allow any offer of proof. Be that as it may, it simply did not deny the motion for that reason. It made plain that it would consider no evidence of incompetence to be substantial, no matter what such evidence might establish: "I have not the slightest doubt of this defendant's sanity or competency to assist with the defense." Having reviewed the record, I am inclined to agree with the court's implicit finding that defendant was often unwilling to cooperate with counsel. But the issue that was crucial—and crucially distinct—was whether defendant was able to do otherwise.

Further, it may well be that after it has conducted a hearing on mental competence, a court may deny a motion for a subsequent hearing unless it is presented with a change of circumstances or new evidence. The court here

could not have properly denied defendant's motion under this principle. Counsel clearly showed a change in circumstances. Since defendant had been found competent prior to trial, almost 18 months had passed and the verdicts and findings determining guilt and penalty had been returned. More clearly still, counsel offered new evidence. Dr. Keyes was a new witness; she had formed a new opinion; and her opinion rested on a new basis.

To be sure, the trial court's erroneous denial of an opportunity for defendant to come forward with evidence of mental incompetence is understandable. Evidently, defendant's refractory behavior tried the patience of practically everyone below. Although understandable, the court's denial was nonetheless erroneous—and prejudicial per se.

Accordingly, I would vacate the judgment as to penalty and remand the cause to the trial court with directions to give defendant the opportunity to raise and litigate the issue of mental competence, and thereafter to impose the appropriate sentence.

Appellant's petition for a rehearing was denied September 19, 1991. Mosk, J. was of the opinion that the petition should be granted.