Filed 8/1/13  P. v. Mays CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B234843 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA374931) |
| v. | |
| WILLIE MAYS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  John S. Fisher, Judge.  Affirmed as modified.

Karli Sager, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Russell A. Lehman, Deputy Attorneys General, for Plaintiff and Respondent

_____

Willie Mays appeals from the judgment after a jury found him guilty of one count of attempted second degree commercial burglary and the court found the prior prison term allegations true. Mays argues that the court erred in revoking his pro per status at the commencement of the trial and in excluding him from the courtroom during a portion of the trial. Those arguments have no merit. We agree, however, that Mays's custody credits should be recalculated.

## FACTS AND PROCEEDINGS BELOW

In the early morning hours Mays attempted the burglary of a Los Angeles dress shop. The store's security camera captured Mays attempting to enter the store through its shattered front window. Jang Lee, the owner of the store, happened to be present and heard the window break. As Lee walked toward the front of the store, he saw Mays outside. Lee testified that he got a good look at Mays for approximately five seconds before Mays ran away. Lee called 911 and described the suspect as a black man wearing a red ski cap and dark clothing. The video from the store's surveillance camera showed Mays wearing a red knit cap, using a cane or crowbar to try to clear glass from in front of the store.

Police officers detained Mays shortly after the 911 call as he walked down a sidewalk near the dress shop. Mays was wearing dark clothing and in his backpack the officers found a red knit cap, a hammer, three gloves and a seven to eight-inch blade. Other officers drove Lee to Mays's location and Lee identified Mays as the person he had seen at the window of his dress shop. Lee identified Mays again at trial. In an interview following his arrest Mays confessed to the police that he broke the window.

### A. Revocation of Self-Representation

The court granted May's request to represent himself at the trial.

On the first day of trial, prior to jury selection, the court asked the prosecutor to "explain who she plans to call and in a nutshell what they would say so that I can get a feel for the time estimate." Before the prosecutor finished her second sentence, Mays interjected: "I object to all of that." The court responded: "Just a second. Let her talk and I'll let you be heard." The prosecutor was about to describe a field show-up

2

involving Mays when Mays asked: "Can I say something, your honor?" The court ignored Mays and the prosecutor continued. While the prosecutor was describing the prior crimes evidence she proposed to introduce, Mays interrupted stating: "What she's alleging . . . ." Before he could complete that sentence the court broke in and said: "Time out. That's the last time I'm going to tell you to stop interrupting."

Mays interrupted the prosecutor three more times as she was describing the pretrial motions that had been heard. After the third interruption, the court stated: "Sir, listen to me one more time. . . . I told you two times not to interrupt. . . . Do you want to really go pro per? Because you're on thin ice with me already and we haven't even been in here 10 minutes. So here's the deal . . . I [will] let you speak when it's appropriate. I will give you a chance, ample opportunity to say your p[ea]ce. But you can't interrupt. You just can't do it. A lawyer's not allowed to do it so certainly you're not. . . . So if you can do it, more power to you. But if you can't [I'll get standby counsel to] come in and take over." The court then allowed Mays to give his version of the pre-trial motions. After Mays finished his explanation the court asked him whether he was "willing to follow the rules and be a pro per[.]" Mays answered: "I'm going to follow the rules as far as I can."

The trial then moved to the jury selection phase. Outside the presence of the prospective jurors, Mays, an African-American, objected that there were no African-Americans in the venire. He asked the court to "get rid of this panel and bring a new panel in." The court denied Mays's request. While the court was discussing the jury panel with the court clerk, Mays interrupted complaining that "[n]one of them are my peers. There are no black people." The court addressed Mays: "Time out. I didn't ask you to speak. The next time you do that you're out of here and you're not going to be a pro per. So don't do that anymore. That's the final time."

Prior to the parties' opening statements, the court explained the procedure to Mays: "[A]ll you're going to do if you want to make [an opening statement] is just tell the jury what you think the evidence is going to be in the case. No editorializing, no argument." Mays began his opening statement by telling the jury: "I'm at a handicap

3

here.  The D.A. gets to walk around, states her story—"[1]  The court interrupted Mays and the following colloquy took place.

"The court:  Time out.  There's no handicap.  Do you want to tell the jury what your side—

"The defendant:  Can I get to that?

"The court:  Go ahead.

"The defendant:  I'm at a handicap here.  I don't have a fancy law—

"The court:  Time out.  Time out.  Time out.  Mr. Mays, one more shot or you're not going to make any statement.  You can tell what the evidence is going to be.

"The defendant:  Let's get on with it.

"The court:  All right.  He declines to make a statement.

"The defendant:  I don't decline to make a statement.  They put their time on my hands and my mouth.

"The court:  Time out.  Jurors to go in the jury room.  Thank you."

Outside the jury's presence, the court revoked Mays's pro per status and directed standby counsel to take over Mays's representation.  The court explained for the record that "[b]ased on his inappropriate behavior in court and his failure to obey court orders the defendant's pro per privileges are now revoked[.]"

## B.  Exclusion From Trial Proceedings

The prosecution's first witness was the dress shop owner.  In the midst of defense counsel's cross-examination, the court halted proceedings, sent the jury to the jury room and directed the bailiff to remove Mays from the courtroom.  Shortly afterward the bailiff brought Mays, handcuffed, to the courtroom door.  The court addressed Mays and his counsel:

"All right.  Mr. Mays, during the testimony you've been laughing and smiling and making noises.  You are disruptive to the court.  You have forfeited for now your privilege to be in this courtroom, at least during [this] testimony.

---

[1]  Mays was confined to his chair at the counsel table during the trial.

4

"I'll reconsider . . . based on my assessment of . . . your stability with respect to following the rules, in a while. But for now you're going in the back. Thank you . . .

"It's too disruptive and he's been doing it the whole time. But that final one was a little too much for me."

The court noted Mays's counsel's objection to his client's removal.

When the jurors returned, the court admonished them not to "speculate about why" Mays was not present. "[It] doesn't have anything to do with the case whether he's guilty or not guilty."

After Mays's exclusion, his counsel completed his cross-examination of the dress shop owner. The jury then heard the direct, cross and redirect examinations of the police officer who apprehended Mays, the officer who witnessed the owner's field identification of Mays and the officer who reviewed the store's surveillance video. Mays was not present for any of this testimony.

Outside the jury's presence the court brought Mays to the door of the courtroom to determine whether he could be identified by the officer who apprehended him. While waiting for Mays to appear his counsel suggested that the court ask him whether "he wants to play nice now[.]" The court responded: "Not yet. The reason is he hasn't obeyed or cooperated on anything that I've asked him. Anything. . . . I've told him very clearly what the rules are and I have been, in my opinion, more than patient with this guy as far as his antics, you know. So, we'll take another look at it when I feel it's appropriate."

The officer identified Mays. Before being removed from the courtroom, Mays asked the court: "Am I being barred from the proceedings? Not even a hearing?" The court began to answer, "Well, you forfeited your right to be here by your conduct. When I—" Mays interrupted, saying: "I've been in county jail since this. You could have left me in county jail and railroaded me and give me what you going to give me." The court ignored Mays's interruption and again ordered him removed from the courtroom.

5

When the jurors returned, the court instructed them that "for the record the officer identified the defendant."

After the officers completed their testimony, the court questioned Mays outside the presence of the jury as to whether he wanted to be present for the remainder of the trial. Mays replied: "I want to be here, but you made my mind up throwing me back here where I can't hear nothing that's going on." The court told Mays that if he remained in the courtroom he could not smile or laugh "because you're looking right—and in a sense you're mocking and laughing at the witness." Mays said that he wanted to remain in the courtroom and promised that he would behave. He caused no further disruptions.

Mays testified in his own defense and denied having anything to do with the attempted burglary of the dress shop. He admitted two convictions for commercial burglary and one conviction for attempted commercial burglary. After his testimony he remained in the courtroom until he voluntarily withdrew in order to pray. He was not present for the rebuttal testimony of the officer who interviewed him following his arrest nor for the closing arguments and jury instructions. He was present when the jury read its verdict.

### C. Verdict And Sentence

The jury deliberated 44 minutes before finding Mays guilty of attempted second degree commercial burglary. Mays waived his right to a jury trial on the prior prison term allegations. The court found the allegations true. Mays was sentenced to an aggregate term of seven years and given 449 days of presentence custody credits calculated as 333 days of actual custody and 116 days of conduct credits.[2]

---

[2]     The parties agree that Mays's custody credits should have been calculated at the "2-for-2" rate under former Penal Code section 4019, subdivision (f). Mays served a total of 333 days prior to the imposition of his sentence. Accordingly, Mays's work and conduct credits are to be calculated by dividing the number of actual days in custody by two, rounding down to the nearest whole number, and multiplying by two. Presentence work and conduct credits are equal to actual credit days, unless the actual number of credit days is odd, as it is in this case. Therefore, the total number of presentence work and conduct credits is calculated by subtracting one from the number of actual custody

## DISCUSSION

## I. THE COURT DID NOT ERR IN TERMINATING MAYS'S SELF-REPRESENTATION.

In *Faretta v. California* (1975) 422 U.S. 806, the United States Supreme Court recognized that the Sixth Amendment gives a criminal defendant the right of self-representation. The court also recognized, however, that a trial court "may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." (*Id*. at pp. 834-835, fn. 46.) Our own Supreme Court has recognized that the trial court "possesses much discretion when it comes to terminating a defendant's right to self-representation and the exercise of that discretion 'will not be disturbed in the absence of a strong showing of clear abuse.' [Citation.]" (*People v. Welch* (1999) 20 Cal.4th 701, 735.)

No abuse of discretion occurred here.

The record shows that Mays interrupted the prosecutor and the court on numerous occasions and continued doing so even after the court warned him four times that if he did not cease his interruptions the court would revoke his pro per status. Mays continued arguing a point after the court had ruled. In addition Mays twice ignored the court's instruction to limit his opening statement to "just tell[ing] the jury what you think the evidence is going to be in the case. No editorializing, no argument." Instead of describing the evidence from his point of view, Mays began his opening statement by telling the jury: "I'm at a handicap here. The D.A. gets to walk around [and state] her story—" After being admonished by the court to limit his statement to his side of the case, Mays again began by stating: "I'm at a handicap here. I don't have a fancy [lawyer.]"

In summary, by the time the court terminated Mays's self-representation, Mays had persisted in interrupting the court and the prosecutor despite the court warning him that if he continued to do so the court would terminate his self-representation. Mays also

---

days. Applying this formula, Mays had 332 actual custody days, so he is entitled to 332 days of work and conduct credits, or a total of 664 days of presence credits.

continued arguing a motion after the court denied it and refused to obey the court's instruction not to use his opening statement to curry sympathy from the jury. Revocation of Mays's self-representation was well within the court's discretion.

## II. ANY ERROR IN EXCLUDING MAYS FROM THE COURTROOM WAS HARMLESS BEYOND A REASONABLE DOUBT.

Implicit in the Sixth Amendment to the United States Constitution and explicit in the California Constitution (art. I, § 15) is the right of a defendant to be present in court during the trial. (*Illinois v. Allen* (1970) 397 U.S. 337; *People v. Jones* (1991) 53 Cal.3d 1115, 1140.) Like other constitutional rights, however, this right is not absolute. In *Allen*, the court "explicitly [held] that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." (*Illinois v. Allen*, *supra,* 397 U.S. at p. 343.) The court's holding is incorporated into Penal Code section 1043, subdivision (b)(1), which provides that when a felony trial has commenced in the defendant's presence it may continue in his absence if "the defendant, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that the trial cannot be carried on with him in the courtroom."

Mays maintains that the court erred procedurally and substantively in excluding him from the courtroom.

The court erred procedurally, he argues, because it did not warn him not to laugh, smile or make noises during the witnesses' testimony as the court was constitutionally and statutorily required to do (*Illinois v. Allen*, *supra,* 397 U.S. at pp. 343, 346; Pen. Code § 1043, subd. (b)(1)) and therefore the court failed to consider alternatives to exclusion, such as moving Mays to the rear of the courtroom where his conduct would not be as easily noticed by the jury (see *Illinois v. Allen*, *supra,* 397 U.S. at p. 347 [suggesting trial courts consider alternatives to removal]). The court erred substantively,

8

Mays argues, because his misconduct was not serious enough to warrant exclusion, the court prevented him from hearing the trial proceedings while he was excluded from the courtroom, the court unreasonably delayed its determination to allow him to return and it unreasonably kept him from returning after prayer.

We need not address Mays's contentions because, even under the most rigorous test for prejudicial error, excluding Mays was harmless beyond a reasonable doubt. (See *People v. Davis* (2005) 36 Cal.4th 510, 532.)

When the court first removed Mays from the courtroom it instructed the jury not to speculate why Mays was not present because "it doesn't have anything to do with the case whether he's guilty or not guilty.

Mays's attorney cross-examined the dress shop owner and the police regarding Mays's identification. Mays has not shown how his presence during the testimony of these prosecution witnesses would have assisted his defense. Moreover, there was overwhelming evidence of Mays's guilt. A video from the store's surveillance camera showed Mays wearing a red ski cap, standing in front of the broken window, holding a cane or crow bar. He had the red cap with him when the police detained him shortly afterward. The store owner positively identified Mays in the field and at trial. Mays admitted to the police that he broke the store window. The court allowed Mays to return to the courtroom and testify in his own defense. It took the jury less than an hour to reach a verdict of guilty.

**DISPOSITION**

The court is ordered to amend the abstract of judgment to reflect 664 total presentence custody credits, and forward the amended abstract of judgment to the California Department of Corrections and Rehabilitation. As so modified, the judgment is affirmed.

NOT TO BE PUBLISHED.


                                        ROTHSCHILD, Acting P. J.

We concur:



CHANEY, J.



JOHNSON, J.

10