Filed 5/21/15  P. v. Antoine CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B250778 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA084846) |
| v. | |
| PAUL ERIC ANTOINE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Alan B. Honeycutt, Judge.  Affirmed in part, reversed in part and remanded with directions to resentence.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and Tannaz Kouhpainezhad, for Plaintiff and Respondent.

————————————

Defendant Paul Eric Antoine appeals from his conviction of second degree burglary.[1] He contends: (1) he was denied effective assistance of counsel; (2) it was prejudicial error to admit a surveillance video into evidence without adequate foundation; (3) selection of the upper term was an abuse of discretion; and (4) under newly enacted Proposition 47, the felony burglary conviction must be reduced to a misdemeanor and the matter remanded for resentencing. We affirm the judgment of conviction, but remand to the superior court with directions to resentence defendant.

## FACTS

A. *People's Case*

Viewed in accordance with the usual rules on appeal (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358), the evidence relating to the single count of which defendant was convicted established that on April 16, 2012, a number of surveillance cameras were spread throughout the Vons/Safeway located on Redondo Beach Boulevard in Gardena. The store had multiple entrances and exits, including one known as the "cart entrance," which was intended solely to be used for pushing empty carts into the store, not customer egress. To exit the store through the cart entrance, a person would have to stoop under a metal rail.

At about 7:00 p.m. that day, store employee Dora Palomino was in the store parking lot, walking towards her car, when she heard a woman saying, "hurry up." Looking in the direction from which the voice was coming, Palomino saw April Barnes in the driver's seat of a green Ford Tempo; defendant was taking loose items (i.e. not

---

[1] Defendant was charged by information with three counts of burglary, occurring on three dates in April and May 2012; prior conviction enhancements were alleged pursuant to the Three Strikes law (Pen. Code, §§ 1170.12, subds. (a) – (d), 667, subds. (b) –(i)) and Penal Code section 667.5, subdivision (b). A jury found defendant guilty of the burglary charged in count one, but could not agree on counts two and three. After the People dismissed the remaining counts, the trial court found true the alleged priors. We discuss the details of defendant's eight-year sentence later in this opinion. He timely appealed.

All future undesignated statutory references are to the Penal Code.

2

bagged) from a shopping cart full of meat, seafood and liquor, and loading them into the back seat of that car.[2] Palomino thought she had seen defendant in the store on one or two prior occasions. On this occasion, he was wearing a brown hooded sweatshirt with the letters "CSUDH" on it. Suspecting the items defendant was unloading from the cart had been stolen from the store, Palomino moved closer. When she was about six feet away, Palomino made eye contact with defendant and asked what he was doing. Defendant said he had paid for the things; Barnes cursed at Palomino. Defendant finished emptying the cart, then got into the passenger seat of Barnes's car. As Barnes drove away, Palomino took a photograph of the car's license plate. Palomino immediately called the store to report the incident, but when no one answered the phone, she went home. The next day, Palomino reported the incident to store manager Steve Parsons. Palomino spoke to a police officer that day and, along with Parsons and the officer, viewed video taken by the store's surveillance cameras the evening before. Palomino pointed out defendant in the video. When Palomino saw defendant with a full shopping cart at the cart entrance a few days later, she alerted Parsons. On this second occasion, defendant left the store without the shopping cart.

After speaking to Palomino on April 17, Parsons reviewed the surveillance video from the evening before. When he saw video of a man ducking under the cart entrance, Parsons back-tracked so that he could follow that man's progress as he filled a shopping cart with about $800 worth of merchandise and took the full cart out of the store through the cart entrance without paying for the goods.[3] Parsons described the man as between

---

**2** Palomino identified Barnes and defendant from photographic line-ups ("six-packs") shown to her in June 2012. She also identified defendant at the preliminary hearing and at trial.

**3** Asked how he arrived at the $800 valuation of the stolen goods, Parsons explained that after the April 16 incident, he put additional security measures in place to prevent anyone from taking a cart out of the store through the cart entrance. A few days later, Parsons was told that a man had abandoned a cart full of merchandise after unsuccessfully trying to take it out through the cart entrance. Parsons reviewed surveillance video of this event and recognized the same man he had seen in the video of

3

50 and 70 years old; wearing a maroon colored, hooded sweatshirt with the letters "DH" on it. Parsons viewed the video about 10 times on the store monitor where the image was clearer than on the courtroom monitor. Parsons provided a copy of the surveillance video to the Gardena police. Over defendant's foundation objection, the video was introduced into evidence as People's Exhibit No. 1 and played for the jury.

Gardena Police Detective Mike Sargent was assigned to investigate several burglaries at the Vons in Gardena. Sargent created a six-pack which included April Barnes, the registered owner of the green Ford Tempo Palomino saw in the parking lot on April 16. After Palomino identified Barnes, Sargent ascertained that Barnes and defendant had the same address in Compton; a man in his early to mid 20's with the same name as defendant was also associated with that address. Sargent looked at photographs of the two men. Because only defendant fit the description of the middle aged suspect (and looked like the person Sargent saw in the April 16 surveillance video), Sargent included only defendant's photograph in the six-pack which he showed Palomino the next day. Palomino identified defendant as the man she saw loading items into Barnes's car on April 16. Sargent went to the Compton address several times to find the car and Barnes, but was unsuccessful.

B.  *Defense Case*

Defendant's girlfriend, Amanda Zilton, testified that in April and May 2012, she and defendant were living together in an apartment in Los Angeles. On Wednesday, April 16, defendant went to Food For Less at about 8:00 or 9:00 a.m. and returned home at about 9:00 or 10:00 a.m.; at 10:30 a.m., Zilton accompanied defendant to a doctor's appointment. Zilton and defendant spent the rest of that day and evening at home with Zilton's children. Zilton never met April Barnes, but knew that defendant and Barnes had a 25-year-old son together.

the April 16 incident. Parsons determined that the value of the items in the abandoned cart was $800, from which he deduced that similar items in the cart the man successfully removed from the store on April 16 had about the same value.

4

Defendant testified that he had never been to the Vons where the thefts occurred. He was about 5'7" or 5'8". In April 2012, defendant was 50 years old and weighed about 245 pounds. A shoulder injury sustained in 2003 makes it impossible for defendant to push a shopping cart. Barnes is the mother of defendant's 25-year-old son, also named Paul Eric Antoine (Antoine Jr.). Barnes was pregnant with Antoine Jr. when defendant's relationship with her ended and defendant did not speak to her for 25 years (in 2004 or 2005, he wrote her one letter while she was in prison). Defendant believed Antoine Jr. lived with Barnes at the address in Compton, but defendant had never lived there. Defendant was also estranged from Antoine Jr. as a result of threats he made when defendant refused to give him money. Antoine Jr. is a gang member and often wears a Cal State Dominguez Hills (CSDH) sweatshirt that is associated with his gang. In July 2012, Barnes and Antoine Jr. called defendant "out of the blue," told him they had committed "some robberies in Gardena" and that defendant had a court date in July 2012. Not knowing what they were talking about, defendant hung up on them. When defendant was arrested in February 2013, he learned that he was being charged with several Vons burglaries. Defendant had prior convictions for robbery (1986), false impersonation (1997) and assault with a deadly weapon (1997).

## DISCUSSION

A.    *Defendant Was Not Denied Effective Assistance of Counsel*

Defendant contends he was denied the effective assistance of counsel as the result of the trial court's denial of defense counsel's request to be relieved because of a "conflict of interest." He argues that counsel's apparent disbelief in his innocence and concerns that complaints had been filed against her by defendant's representatives "undoubtedly created a conflict of interest for counsel." We find no error.[4]

---

[4]    In a separate Petition for Habeas Corpus Relief, defendant argues that his trial counsel was ineffective for the same reasons set forth in the appeal. By separate order we summarily deny defendant's habeas petition.

5

Concomitant with the constitutional right to effective assistance of counsel, a criminal defendant has the right to representation that is free from conflicts of interest. (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*); *People v. Bonin* (1989) 47 Cal.3d 808, 833-834 (*Bonin*).) Thus, conflict of interest claims are a category of ineffective assistance of counsel claims. (*Doolin,* at p. 417.) As with any ineffective assistance of counsel claim, to prevail "generally requires a defendant to show (1) counsel's deficient performance, and (2) a reasonable probability that, absent counsel's deficiencies, the result of the proceeding would have been different. [Citations.] In the context of a conflict of interest claim, deficient performance is demonstrated by a showing that defense counsel labored under an *actual conflict of interest* 'that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' [Citations.] '[I]nquiry into actual conflict [does not require] something separate and apart from adverse effect.' [Citation.] 'An "actual conflict," for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance.' [Citation.]" (*Id.* at pp. 417-418, italics added.)[5]

Once advised of the possibility of a conflict of interest on the part of defense counsel, the trial court must inquire into the matter and act in response to the information it gathers. If the trial court determines there is no conflict or the risk of conflict is too remote, it may decline to take any action at all. (*Doolin*, *supra*, 45 Cal.4th at p. 837.) Failure to inquire into the possibility of a conflict of interest or to adequately act in response to information revealed by such inquiry is known as *Wood* error (see *Wood v. Georgia* (1981) 450 U.S. 261, 272). "To obtain reversal for *Wood* error, the defendant need not demonstrate specific, outcome-determinative prejudice. [Citation.] But he must show that an actual conflict of interest existed and that that conflict adversely affected

---

[5] This should be distinguished from challenges to rulings on counsel's motion to withdraw, which are reviewed for abuse of discretion. (See *Lempert v. Superior Court* (2003) 112 Cal.App.4th 1161, 1173 [issuing a peremptory writ directing the trial court to vacate its order denying trial counsel's motion to withdraw as attorney of record for criminal defendant, and to enter a new order granting the motion].)

counsel's performance. [Citations.]" (*Bonin*, *supra,* 47 Cal.3d at p. 837; *People v. Hardy* (1992) 2 Cal.4th 86, 135, 139 (*Hardy*) [relief for conflict of interest is premised on actual conflict, not the mere appearance of conflict].)

Conflicts between a criminal defendant and his or her counsel arise in various factual settings. Most common are situations in which counsel's efforts on the defendant's behalf are threatened by counsel's responsibilities to another client, a third person or by counsel's own interest. (*People v. Jones* (1991) 53 Cal.3d 1115, 1138 (*Jones*), citing *Bonin, supra*, 47 Cal.3d. at p. 835.) But "a conflict may exist 'whenever counsel is so situated that the caliber of his services may be substantially diluted.' [Citation.]" (*Hardy, supra,* 2 Cal.4th at p. 135.)

In *Jones, supra*, our Supreme Court held that defense counsel's fear that his or her representation of the defendant may lead to discipline by the State Bar did not create a conflict of interest: "It would appear that fear of investigation by the State Bar would inspire an attorney to perform more, rather than less, competently." (*Jones, supra*, 53 Cal.3d at p. 1135.) Similarly, in *Hardy, supra*, the court found no conflict of interest arose from the criminal defendant's federal court action against defense counsel for negligent misrepresentation in the still pending criminal matter. The *Hardy* court observed: "Although the possibility of a conflict was posed on these facts, we echo the sentiments of the Eighth Circuit Court of Appeals: 'We recognize the danger of any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys. [Citation.] A patently frivolous lawsuit brought by a defendant against his or her counsel may not, alone, constitute cause for appointment of new counsel. Trial judges must be wary of defendants who employ complaints about counsel as dilatory tactics or for some other invidious motive.' [Citations.]" (*Hardy, supra,* 2 Cal.4th at p. 138, italics omitted.)

It is also well settled that "the adequacy of legal representation is not measured by the subjective or objective belief of trial counsel as to a defendant's innocence or the viability of certain defenses." (*People v. Corona* (1978) 80 Cal.App.3d 684, 723.) Rather, trial counsel has a duty to determine the availability of any defense to the charges

based on investigation of facts and research of law, not personal impression or belief. (*Ibid.*) In *Jones*, the court distinguished between a conflict of interest and conflicting trial strategies. (53 Cal.3d at p. 1138.) The defendant in *Jones* believed he could convince the jury that there was a reasonable doubt that he committed the two charged murders; defense counsel believed that a mental state defense would be better. "Because this difference of opinion on strategy did not create a situation in which counsel's efforts on defendant's behalf were threatened by 'responsibilities to another client or a third person or by his own interests' [citation], there was no conflict of interest." (*Ibid.*)

This case is similar to *Jones*. Here, at a hearing on April 18, 2013, defendant reluctantly agreed to waive time so that defense counsel would have an opportunity to review surveillance tapes obtained from the prosecutor that day. A month later, on May 15, defense counsel declared a "conflict of interest." Following an unreported discussion with counsel, the trial court stated:

> "We've had an extensive conversation. [Defense counsel] has indicated the current difficulties and has explained her request to be relieved. In essence, [defendant] has had representatives of his own personal interests in this case contact [defense counsel] indicating that complaints have been filed against her for conduct in this case. There have been documents that have been filed by [defendant]. . . .
> "... I am not relieving [defense counsel] in this case. She's the attorney of record. She's a very experienced, well respected practitioner. The court is not accepting any documents that are filed individually by [defendant] in this matter or any other representatives of [defendant's] except [defense counsel] or the counsel of record in this case.
> [Defense counsel] is the attorney in this case. She's the one that directs the trial tactics; directs the investigation of this case. She is the person that is the attorney, not [defendant.]"

At the same hearing, defense counsel requested color versions of the still photographs taken from the surveillance video by the prosecution; defense counsel explained color photographs were necessary to support defendant's contention that he was not the person in the video. The trial court responded:

8

"If you, as the trial counsel, feel that it is necessary to have . . . enhancements provided . . . I'll take that into consideration if you submit an order for an appointment of a lab or an expert.

"But, again, you are the trial counsel. You are the person making the decisions. If you're submitting a declaration to this court, I intend and I would expect you have made an independent decision on your own and that you feel it is necessary for a defense of [defendant] for the expenditure or appointment of an expert for that purpose. It's not [defendant] making the tactical decision in the trial."

It does not appear from the appellate record that defendant subsequently sought a defense photography expert.[6] Even though counsel had voiced to the trial court her concerns about a conflict, defendant himself never made a *Marsden* motion seeking new counsel.[7]

This record demonstrates that the trial court inquired into the alleged conflict of interest between defendant and his trial attorney, and ascertained it was based on (1) complaints filed against defense counsel by defendant's representatives and (2) counsel's belief that it was defendant in the surveillance videos notwithstanding defendant's steadfast denial. The trial court correctly found these facts did not create a conflict of interest. Under *Jones* and *Hardy*, we agree.

B.      *The Surveillance Video Was Properly Admitted*

Defendant contends the trial court prejudicially erred in admitting into evidence People's Exhibit. No. 1, which was the April 16 surveillance video, over his foundation objections. He argues Parsons's testimony was insufficient to establish that the video "was an accurate depiction of what was going on at the store [at the relevant time]." We find no error.

---

**6**      Immediately prior to the beginning of voir dire on May 30, defendant's desire to see the surveillance video for himself was discussed. Because defense counsel did not have a video player, it was agreed that defendant would view the video on the prosecution's equipment. Nothing in the record suggests that appellant was not given the opportunity to view the video.

**7**      *People v. Marsden* (1970) 2 Cal.3d 118.

9

Challenges to rulings regarding the admission of evidence are reviewed for abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*).) Under that standard, we conclude the trial court did not err in admitting the challenged surveillance video into evidence over defendant's foundation objection.

For evidentiary purposes, a photograph is a writing which, like any other writing, must be authenticated before it may be admitted into evidence. (*Goldsmith, supra*, 59 Cal.4th at p. 268.) Authentication requires evidence sufficient to support a finding that the photograph is a fair and accurate representation of the scene. (*Goldsmith, supra*, at p. 267; see Evid. Code, § 1400 ["Authentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law."].) The burden is on the proponent of the evidence to make this prima facie showing. (*Ibid*.)

Under Evidence Code section 1400, subdivision (b), authentication may be supplied by a statutory presumption. (*Goldsmith, supra*, 59 Cal.4th at p. 268.) For example, a "printed representation of images stored on a video or digital medium" is presumed authentic under Evidence Code section 1553, subdivision (a) which reads:

> "A printed representation of images stored on a video or digital medium is presumed to be an accurate representation of the images it purports to represent. This presumption is a presumption affecting the burden of producing evidence. If a party to an action introduces evidence that a printed representation of images stored on a video or digital medium is inaccurate or unreliable, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the existence and content of the images that it purports to represent."

Evidence Code section 1552, subdivision (a) provides a similar presumption for a "printed representation of computer information or a computer program." These presumptions apply to photographs and video taken by surveillance cameras. (*People v. Peyton* (2014) 229 Cal.App.4th 1063 (*Peyton*).) In *Peyton*, the victim's ATM card and address book in which her ATM identification number was recorded were stolen from her

10

car; later that day, the defendant used the victim's ATM card to withdraw $300. The ATM system videotaped the transaction and purged the video but saved still photographs extracted from the video. About three months after the burglary, a detective asked to see the photographs. The bank's fraud investigator copied the photos and forwarded them to the detective. At trial, the bank's investigator testified that her job duties required that she know how the ATM system worked and how to extract the ATM photos. The *Peyton* court rejected the defendant's hearsay and lack of business records foundation challenges to admission of the ATM photographs. The court reasoned that the Evidence Code sections 1552 and 1553 presumptions supported the trial court's finding that the photographs were accurate representations of the ATM transaction and the bank investigator possessed sufficient knowledge to explain how Wells Fargo maintained and used the photos in the regular course of business to make the photos admissible as business records. (*Id.* at p. 1075.)

Here, Parsons testified that he had worked for Vons/Safeway for 35 years and had been a store manager for 18 years. People's Exhibit No. 1 was a copy of video taken by the store's surveillance equipment; Parsons had viewed the video at the store and then gave a copy to the police. Once a month, an in-house loss prevention team inspected the store, audited the surveillance video and checked for accuracy of the time stamp. Under *Peyton*, the Evidence Code sections 1552 and 1553 presumptions were sufficient to establish that the surveillance video accurately depicted what occurred in the store during the relevant time period and Parsons possessed sufficient knowledge of how the store maintained its surveillance system to make the video admissible as a business record.

C.    *Proposition 47 Aside, There Was No Abuse of Discretion in the Trial Court's Sentencing Choice*

Defendant contends: (1) he was entitled to a misdemeanor sentence under Proposition 47; and (2) selection of the upper term was an abuse of discretion. We conclude that defendant's interpretation of Proposition 47 is correct, making his second contention moot.

11

<u>Proposition 47 is Retroactive</u>

At the time defendant was sentenced on August 13, 2013, second degree burglary was punishable as either a misdemeanor or a felony. (§ 461, subd. (b); see § 17.) The trial court selected the high term felony sentence and defendant has been serving that sentence while this appeal has been pending. In the interim, voters enacted Proposition 47, "The Safe Neighborhoods and School Act."[8] Under Proposition 47, some drug and theft-related offenses that were previously felonies or "wobblers" are now misdemeanors unless committed by certain ineligible defendants. Relevant here is section 459.5, which created misdemeanor "shoplifting" for what otherwise would be a commercial burglary when the crime takes place during regular business hours and the value of the property taken does not exceed $950.[9] Section 459.5 is not applicable to persons who have previously been convicted of certain enumerated crimes. (§ 459.5, subd (a); see § 667 subd. (e)(2)(C)(iv).) Because the value of the property defendant took was less than $950, his crime was committed in a commercial establishment during regular business hours, and he has no disqualifying prior convictions, defendant contends his felony

---

[8]     Voters enacted Proposition 47 on November 4, 2014, and it went into effect the next day. (Cal. Const., art. II, § 10, subd. (a).)

[9]     Section 459.5 reads:
"(a) Notwithstanding Section 459 [defining burglary], shoplifting is defined as entering a commercial establishment with intent to commit larceny while that establishment is open during regular business hours, where the value of the property that is taken or intended to be taken does not exceed nine hundred fifty dollars ($950). Any other entry into a commercial establishment with intent to commit larceny is burglary. Shoplifting shall be punished as a misdemeanor, except that a person with one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290 may be punished pursuant to subdivision (h) of Section 1170.

(b)  Any act of shoplifting as defined in subdivision (a) shall be charged as shoplifting. No person who is charged with shoplifting may also be charged with burglary or theft of the same property."

burglary conviction must be reduced to misdemeanor shoplifting and the matter remanded to the trial court for resentencing.[10]

Defendant's argument is largely predicated on the *Estrada* rule, by which a statutory amendment that mitigates punishment operates with limited retroactivity (i.e. applies in all cases in which judgment was not yet final when the amendment took effect), unless the statute has a savings clause. (*In re Estrada* (1965) 63 Cal.2d 740, 747.) The People counter that the *Estrada* rule is inapplicable because section 1170.18, subdivision (a), which was also created by Proposition 47, operates as the "functional equivalent of a savings clause."[11] As we shall explain, defendant is correct and section 459.5 applies to him. Accordingly, we remand for resentencing.

*People v. Noyan* (2014) 232 Cal.App.4th 657 (*Noyan*), the only published case to discuss the retroactivity of Proposition 47, was filed after supplemental briefing in this

---

**10** Although defendant has suffered several prior convictions, his two most serious ones, robbery and assault with a deadly weapon, do not preclude the misdemeanor treatment of his current shoplifting offense under section 459.5, subd. (a).

**11** Section 1170.18, subdivisions (a) and (b) read:

"(a) A person currently serving a sentence for a conviction, whether by trial or plea, of a felony or felonies who would have been guilty of a misdemeanor under [Proposition 47 had it] been in effect at the time of the offense may petition for a recall of sentence before the trial court that entered the judgment of conviction in his or her case to request resentencing in accordance with Sections 11350, 11357, or 11377 of the Health and Safety Code, or Section 459.5, 473, 476a, 490.2, 496, or 666 of the Penal Code, as those sections have been amended or added by this act.

(b) Upon receiving a petition under subdivision (a), the court shall determine whether the petitioner satisfies the criteria in subdivision (a). If the petitioner satisfies the criteria in subdivision (a), the petitioner's felony sentence shall be recalled and the petitioner resentenced to a misdemeanor pursuant to Sections 11350, 11357, or 11377 of the Health and Safety Code, or Section 459.5, 473, 476a, 490.2, 496, or 666 of the Penal Code, those sections have been amended or added by this act, unless the court, in its discretion, determines that resentencing the petitioner would pose an unreasonable risk of danger to public safety. In exercising its discretion, the court may consider [specified factors]."

13

case was completed. The defendant in *Noyan* was convicted of, among other things, violations of section of Health and Safety Code section 11370 [possession of a controlled substance]. The case primarily turned on an equal protection analysis of two statutes prohibiting the unlawful introduction of alcohol and controlled substances into county jail. The defendant also argued the appellate court should reduce his convictions from felonies to misdemeanors pursuant to Proposition 47's amendment to Health and Safety Code section 11350, subdivision (a) which had occurred after his sentencing date but before his case was final. Without analysis, the *Noyan* court held that, to obtain a reduction of his conviction from a felony to a misdemeanor, defendant was "limited to the statutory remedy of petitioning for recall of sentence in the trial court once his judgment is final, pursuant to Penal Code section 1170.18. [Citation.]" (*Noyan*, *supra,* at p. 672.) *Noyan* relied exclusively on *People v. Yearwood* (2013) 213 Cal.App.4th 161, 170, 177 (*Yearwood*) and did not mention the Supreme Court's *Estrada* rule of limited retroactivity.

Proposition 47 was not at issue in *Yearwood,* which dealt with the earlier adopted Proposition 36. *Yearwood* concerned the retroactivity of the earlier adopted Proposition 36 which "amended the Three Strikes law so that an indeterminate life sentence may only be imposed where the offender's third strike is a serious and/or violent felony or where the offender is not eligible for a determinate sentence based on other disqualifying factors. (Pen. Code, §§ 667, subd. (e)(2)(C), 1170.12, subd. (c)(2)(C).) [Footnote omitted.]" (*Teal v. Superior Court* (2014) 60 Cal.4th 595, 596.) *Yearwood* and Proposition 36 are instructive on our Proposition 47 analysis because the statutes contain nearly identical language.

Pursuant to the former Three Strikes law, the defendant in *Yearwood* received a life sentence for possession of marijuana in prison (§ 4573.6). While his appeal was pending, the voters enacted Proposition 36. On appeal, Yearwood argued that *Estrada* dictated that his life sentence should be vacated and that he be resentenced under the amended Three Strikes law. (*Yearwood, supra,* 213 Cal.App.4th at p. 172.) The Court of Appeal disagreed. It reasoned that section 1170.126, subdivision (b), which was also

14

created by Proposition 36, took section 4573.6 out of the *Estrada* rule. Section 1170.126, subdivision (b) established a procedure for an offender serving a life sentence for a conviction that is not defined as a serious and/or violent felony to file a petition for recall of sentence. After his appeal became final – the judgment was affirmed – Yearwood would have to petition the trial court for recall of the sentence under section 1170.26 in a separate post-conviction proceeding. (*Yearwood,* at p. 175.) The *Yearwood* court explained: "The *Estrada* rule does not apply to [Proposition 36] because section 1170.126 operates as the functional equivalent of a savings clause. Section 1170.126 is not ambiguous. The voters intended a petition for recall of sentence to be the sole remedy available under the Act for prisoners who were serving an indeterminate life sentence imposed under the former three strikes law on the Act's effective date without regard to the finality of the judgment." (*Id*. at p. 172.)[12]

We disagree with *Yearwood*'s analysis and choose not to follow it. We begin with the most basic rule of statutory construction: If the meaning of the plain, commonsense language of the statute is unambiguous, the plain meaning controls. " '[C]ourts will not "interpret away clear language in favor of an ambiguity that does not exist." [Citation.]' [Citation.] Nor will they countenance efforts to create an ambiguity by reference to extrinsic evidence; outside sources simply do not come into play when the language of a statute is clear and unambiguous. [Citation.]" (*People v. Dunbar* (2012) 209 Cal.App.4th 114, 117.) "In addition, the Legislature is deemed to be aware of existing laws and judicial decisions in effect at the time legislation is enacted and to have

---

[12] Our Supreme Court denied review in *Yearwood* but the issue of whether the Proposition 36 amendments to the Three Strikes law apply to defendants before their judgments are final is currently pending before the Supreme Court in other cases. (See, e.g., *People v. Contreras* (2013) 221 Cal.App.4th 558, review granted Jan. 29, 2014, S215516 [holding Proposition 36 amendments apply retroactively]; *People v. Lester* (2013) 220 Cal.App.4th 291, review granted Jan. 15, 2014, S214658 [same with a dissent]; *People v. Lewis* (2013) 216 Cal.App.4th 468, review granted Aug. 14, 2013, S211494 [same]; *People v. Conley* (2013) 215 Cal.App.4th 1482, review granted Aug. 14, 2013, S211275 [holding the amendments are not retroactive].)

15

enacted and amended statutes ' "in the light of such decisions as have a direct bearing upon them." ' [Citations.]" (*People v. Overstreet* (1986) 42 Cal.3d 891, 897.)

"When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*In re Estrada*, *supra,* 63 Cal.2d at p. 744.)

Application of these rules requires us to conclude that the voters intended Proposition 47 to be retroactive to those cases not yet final. Here, section 459.5 undisputedly lessens the punishment for any burglary of a commercial establishment committed during business hours and involving property valued at less than $950; it does not contain a savings clause. If Proposition 47 created only section 459.5, it would be clear that the law applied to defendants whose judgments were not yet final under the *Estrada* rule. But our analysis does not end there because Proposition 47 also created section 1170.18.

As relevant here, section 1170.18 allows an inmate serving a felony sentence for burglary that would have been misdemeanor shoplifting under section 459.5 had section 459.5 been in effect at the time of the offense, to petition for resentencing under section 459.5. (§ 1170.18, subd. (a).)[13] Subdivision (b) of section 1170.18 gives the trial court discretion to deny resentencing if it determines the petitioner would pose an unreasonable risk of danger to public safety. Subdivision (m) of section 1170.18 states:

---

[13]    Similar to section 459.5, section 1170.18 does not apply to "persons who have one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290." (§ 1170.18, subd. (i); see § 459.5, subd. (a) [" . . . except that a person with one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290 may be punished pursuant to subdivision (h) of Section 1170."].) None of defendant's prior convictions fall within this exclusion.

16

"Nothing in this section is intended to diminish or abrogate any rights or remedies otherwise available to the petitioner of applicant."

The right to be resentenced under *Estrada* is a right available to a defendant whose judgment is not yet final. Under *Overstreet*, the Legislature must be deemed to have been aware of the *Estrada* rule at the time it enacted section 1170.18, subdivision (m) and to have enacted the statute in light of that decision. For these reasons, we remand with instructions to the trial court to resentence defendant under section 459.5.

## DISPOSITION

The judgment of conviction is affirmed, but the matter is remanded to the trial court with directions to hold a resentencing hearing within 30 days after the finality of this opinion. The superior court is directed to impose sentence pursuant to section 459.5, issue an amended abstract of judgment reflecting the sentence as modified and provide a copy of the amended abstract to the parties and to the Department of Corrections and Rehabilitation within 30 days after resentencing.


RUBIN, J.

WE CONCUR:



BIGELOW, P. J.



FLIER, J.


17